**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION
AT CINCINNATI**

| | | |
|---|---|---|
| **BRAVE OPTICAL, INC., WESTERN STATE OPTICAL, INC., and DH RETAIL, INC.,** On Behalf of Themselves and All Others Similarly Situated, | § § § § § § | **CIVIL ACTION NO.** **JUDGE** |
| **Plaintiffs,** | § § | |
| v. | § § | **CLASS ACTION COMPLAINT** |
| **LUXOTTICA OF AMERICA INC. f/k/a LUXOTTICA RETAIL NORTH AMERICA,** | § § § § § | **(JURY DEMAND ENDORSED HEREON)** |
| **Defendant.** | § § § | |

Plaintiffs, Brave Optical, Inc. ("Brave"), Western State Optical, Inc. ("Western State"), and DH Retail, Inc. ("DH"), on behalf of themselves and all the unnamed members of the proposed Class similarly situated, for their Class Action Complaint for Money Damages and for Declaratory and Injunctive Relief against Defendant, Luxottica of America, Inc., f/k/a Luxottica Retail North America, d/b/a Pearle Vision ("Luxottica"), hereby claim, allege, state and aver as follows:

**NATURE & BASIS OF ACTION**

Plaintiffs represent dozens of small franchisees who sell vision care products and services to their communities. Many of these franchise owners are first-time franchise owners who operate only one or two stores. Many owners invested years of their savings in a chance to operate this much-needed franchise business. Others owned successful independent optical businesses before being convinced to acquire a Pearle Vision franchise.

But, as the saying goes, all that glitters is not gold. And as Plaintiffs discovered, owning a

Pearle Vision is far from a golden opportunity. First, after inducing them to purchase a franchise, Luxottica imposed onerous new burdens on its franchisees to benefit itself at the franchisees' expense. For example, Luxottica forced franchisees to use Eyecon, claiming that Eyecon is a turnkey supply chain solution with a point-of-sale system. In reality, Eyecon is a way for Luxottica to offload older, unfashionable, and unpopular frames on franchisees who have no choice but to purchase them, regardless of their salability. Franchisees who were previously able to select their merchandise for their stores were suddenly unable to cater to customer demands. Worse, Luxottica used participation in specific managed vision care programs — which prospective franchisees were told was within their discretion — as a weapon to force franchisees to participate in Eyecon. Franchisees who could not participate in managed vision care programs lost income and access to large customer bases covered by those programs.

Further, even when franchisees were able to contract directly with and participate in managed vision care programs, unbeknownst to franchisees, Luxottica maintained "master agreements" with those companies that enabled them to cancel a franchisee's contract at will. Finally, Luxottica demanded franchisees use an approved point-of-sale system, which was subject to Luxottica's complete control despite franchisees contracting directly with the owner of the system. As a result, Luxottica had unfettered access to franchisees' operational data, which it negligently maintained, resulting in several unauthorized access incidents that damaged the franchisees.

Luxottica took these actions intentionally for its sole benefit or negligently, resulting in crippling financial costs to the franchisees.

## PARTIES & SERVICE

1.      Brave is a former franchisee that owned two Pearle Vision franchises in Plano, Texas, between 2016 and 2022. Brave is organized under the laws of the State of Texas and has its principal place of business in Plano, Texas. Pursuant to 28 U.S.C. 1332(c), Brave is a citizen of the State of

Texas.

    a.  Brave acquired its Pearle Vision stores through franchise agreements with Luxottica dated 2011 and 2013.

2.    Western State is a corporation organized and existing under the laws of the State of Colorado with its principal place of business in Colorado Springs, CO. Pursuant to 28 U.S.C. 1332(c), Western State is a citizen of the State of Colorado.

    a.  Western State is a current Pearle Vision franchisee that owns one franchise in Colorado Springs, CO.

    b.  Western State purchased its Pearle Vision store through a franchise agreement with Luxottica dated 2019.

3.    DH is a corporation organized and existing under the laws of the State of Massachusetts with its principal place of business in Boston, MA. Pursuant to 28 U.S.C. 1332(c), DH is a citizen of the State of Massachusetts.

    a.  DH is a current Pearle Vision franchisee that owns one franchise in Boston, MA.

    b.  DH purchased its Pearle Vision store through a franchise agreement with Luxottica dated 2018.

4.    Luxottica (also sometimes referred to herein as "Pearle Vision" or "Pearle") is an Ohio corporation with its principal place of business at 4000 Luxottica Place, Mason, Ohio 45040. Luxottica may be served by serving its registered agent, National Registered Agents, Inc., 4400 Easton Commons Way, Suite 125, Columbus, OH 43219. Pursuant to 28 U.S.C. 1332(c), Luxottica is a citizen of the State of Ohio.

5.    The parties in this matter are "diverse" under the Class Action Fairness Act of 2005 because at least one plaintiff is a citizen of a state different from the citizenship of at least one defendant.

6. All Plaintiffs are citizens of either Texas, Colorado, or Massachusetts pursuant to 28 U.S.C. 1332(c).

7. Plaintiffs have no information suggesting that any defendant's principal place of business or place of incorporation is located in any plaintiff's state of citizenship.

### JURISDICTION & VENUE

8. This Court has subject-matter jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. 1332(d)(2), because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, there are at least 100 members of the proposed Class, and Luxottica is a citizen of a state different from that of at least one Class member.

9. The parties in this matter are diverse, as contemplated by the Class Action Fairness Act of 2005. At least one plaintiff is a citizen of a state different from at least one defendant.

    a. Western State is a citizen of the State of Colorado pursuant to 28 U.S.C. 1332(c).

    b. **DH** is a citizen of the State of Massachusetts pursuant to 28 U.S.C. 1332(c).

    c. Brave is a citizen of the State of Texas pursuant to 28 U.S.C. 1332(c).

    d. Luxottica is a citizen of the State of Ohio pursuant to 28 U.S.C. 1332(c).

10. Venue is proper in this judicial district pursuant to 28 U.S.C. 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this district. Also, venue is proper in this district under 28 U.S.C. 1391(b)(2) because Luxottica has its principal place of business in Ohio at 4000 Luxottica Place, Mason, OH 45040, and is a citizen of the State of Ohio for diversity purposes. Finally, venue is proper in this district because the franchise agreements applicable to this action select this district as the appropriate agreed venue.

### PLAINTIFFS' CLASS ALLEGATIONS

11. Plaintiffs bring this action as a Class Action pursuant to Rule 23(a) and Rule 23(b)(3)

of the Federal Rules of Civil Procedure on behalf of all persons who, from 2013 through 2022, entered into or acquired franchise agreements with Luxottica for Pearle Vision stores. The proposed Class consists of current and former Pearle Vision franchisees from 37 states. Excluded from the Class are Defendants herein, their respective affiliates, owners, officers, directors and legal representatives, any judicial officer who enters an order in this case, and the respective heirs, successors, or assigns of any such excluded party.

12.     The proposed Class consists of current and former franchisees who entered into or acquired a Pearle Vision franchise agreement dated in any year from 2013 through 2023, inclusive. Luxottica impermissibly requires these franchisees to utilize Eyecon and to purchase all — or substantially all — of their inventory from Luxottica. Further, Luxottica impermissible requires the Class members to utilize Eyecon as a condition of renewal or to participate as an in-network provider for VSP. Many Class members were promised complete control of inventory management and the managed vision care plans in which they participated. Further, the Class members were forced to accept lower reimbursement rates from Eyemed, VSP, and other managed vision care programs than they could have recovered as an independent retail store due to the price-fixing conspiracy perpetuated by those companies and Luxottica as described herein. Luxottica also defrauded the Class members by, among other things, failing to disclose the price-fixing scheme relative to independent retail stores and by failing to disclose or materially misrepresenting the mechanics and benefits of Eyecon as described herein.

13.     The proposed Class also consists of former franchisees who owned Pearle Vision stores during the previous ten years and sustained unique damages as a result of their efforts to sell or otherwise dispose of their franchises. Luxottica's actions described herein damaged the value of Pearle Vision stores to such an extent that former franchisees could not recoup all — and in some cases any — value for their investments.

14.     The Class members are so numerous that the joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs, on information and belief Luxottica entered or maintained approximately 400 franchise agreements with franchisees during the applicable period.

15.     The named Plaintiffs' claims are typical of the claims of one or more classes because Plaintiffs and the members of the defined Classes sustained damages that arose from Luxottica's wrongful conduct, including antitrust violations, fraud, and statutory violations.

16.     Plaintiffs are representative parties who will fully and adequately protect the interests of the Class members.  Plaintiffs have retained experienced and competent counsel in both class action and commercial litigation, including breach of contract and franchise law.  Plaintiffs have no interests contrary to or in conflict with those of the Class members they seek to represent.

17.     A class action would be superior to all other methods for adjudicating this controversy fairly and efficiently.  Plaintiffs know of no difficulty managing this action that would preclude its maintenance as a class action.

18.     The prosecution of separate actions by individual Class members would create a risk of inconsistent and varying adjudications concerning the subject of this action, which adjudication could establish incompatible standards of conduct for Defendants under the laws alleged herein. Further, questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally application to the entire Class.  Among the questions of law and fact common to the Class are:

   a.   Did Luxottica defraud the Class members by failing to disclose the price-fixing scheme with VSP and Eyemed, resulting in lower reimbursement rates for Pearle Vision franchisees and vision health providers than other independent stores or providers?

   b.   Did Luxottica defraud the Class members by failing to disclose the true mechanics and consequences of Eyecon, including that the system did not operate as a true supply chain management system or select inventory based on the franchisee's

customer base and past sales and that it forced low-quality, unfashionable, and unsellable inventory on users at inflated prices?

c. Did Luxottica violate applicable antitrust laws by conspiring with Eyemed and VSP to fix and suppress reimbursement rates paid to Pearle Vision franchisees so that these franchisees received lower reimbursements from the managed vision care companies than other independent optical retailers?

d. Did Luxottica violate applicable antitrust laws by tying a franchisor's ability to renew their franchise agreement and to participate as an in-network provider with VSP to participation in Eyecon?

e. Did Luxottica breach its franchise agreements with the Class members by requiring franchisees to utilize Eyecon?

f. Did Luxottica breach the franchise agreements by failing to disclose information to the franchisees about its master agreement and price-fixing scheme with VSP and Eyemed?

g. Did Luxottica breach the franchise agreements by limiting a franchisee's ability to become an in-network participant in managed vision care plans?

h. Did Luxottica breach the franchise agreements with the Class members by obtaining their proprietary data without their knowledge or consent?

i. Did Luxottica breach the franchise agreements by charging royalties on the dispensing fees for Medicaid glasses?

j. Did Luxottica breach an implied covenant of good faith and fair dealing by acquiring proprietary data without the Class members' knowledge or consent?

k. Did Luxottica breach an implied covenant of good faith and fair dealing by requiring franchisees to utilize Eyecon?

l. Has Luxottica tortiously interfered with the franchisees' current contractual and business relations with third parties, including AcuityLogic and managed vision care plans?

m. Has Luxottica tortiously interfered with the franchisees' prospective business relationships, including potential customers and vendors?

n. Did Luxottica misrepresent and/or fail to disclose material facts about Eyecon to potential franchisees?

o. Did Luxottica make material misrepresentations and/or fail to disclose material facts to potential franchisees about participation in managed vision care programs?

p. Did Luxottica make negligent misrepresentations about Eyecon to potential franchisees?

q. Did Luxottica make negligent misrepresentations to potential franchisees about participation in managed vision care programs?

FACTUAL ALLEGATIONS

*The World's Largest Eyewear Company owns Pearle Vision*

19.     The first Pearle Vision location opened in 1961. Pearle Vision began franchising in December 1980. By 2022, nearly 450 Pearle Vision franchised stores were open around the United States, in addition to 60 or more "company" (Luxottica-owned) stores.

20.     The ultimate owner of Pearle Vision ("Pearle") is EssilorLuxottica, S.A., a French joint-stock company. Luxottica, Pearle's corporate parent, merged with Essilor in 2018. Luxottica is a dominant player in the US eyewear retail market and the world's largest company in the eyewear industry, with a market capitalization of about $70 billion and annual revenues in the tens of billions of dollars.

21.     Luxottica owns numerous US eyeglass retailers, including LensCrafters, Pearle, Target Optical, and Sunglass Hut.[1] Luxottica also owns glasses.com, which sells eyewear over the internet. In 2018, Luxottica acquired Vision Source, L.P., a franchisor whose franchisees are independent opticians who own their stores.[2] In 2018, Vision Source, L.P., and Luxottica-owned retail stores in the U.S. had combined sales of $5,310,000,000 out of total U.S.-based retail store sales of $14,364,000,000, exceeding 1/3 of total sales.

22.     Luxottica also owns or has acquired the license to sell numerous eyeglass brands.

---

[1] *Id.* 37-38. FDD at 2 ("Luxxotica operates its retail segment principally through its retail brands, which include, among others, LensCrafters, Sunglass Hut, Pearle Vision, ILORI, The Optical Shop of Aspen, OPSM, Laubman & Pank, Budget Eyewear, Bright Eyes, Just Spectacles, Oakley "O" Stores and Vaults, David Clulow, Oliver Peoples, EconOpticas, Sun Planet and our Licensed Brands (Sears Optical and Target Optical). As of December 31, 2011, our retail business consisted of 6,511 corporate stores and 531 franchised or licensed as shown in the table below …"). Luxottica licenses the Target and Sears brand but operates the stores. FDD at 10.

[2] https://www.visionmonday.com/CMSDocuments/2019/05/vmtop50retailers_VM0519_r1.pdf at 2.

Luxottica owns Vogue Eyewear, Persol, Ray-Ban, Oakley, and Alain Mikli. Luxottica has licensed the right to sell eyewear from multiple brands, including Armani, Burberry, Chanel, Ralph Lauren, DKNY, Michael Kors, Versace, and Dolce & Gabbana. Luxottica sells its frames not just to Pearle franchisees but to eyewear retailers throughout the United States.

23.     Luxottica's dominance of the global eyewear market has led to media attention. A March 5, 2019, *L.A. Times* column entitled "How badly are we being ripped off on eyewear? Former Industry Execs Tell All" quoted a former eyewear executive that "[t]here is no competition in the industry, not anymore," because "Luxottica bought everyone. They set whatever prices they please." The article recounts Luxottica's history of acquiring retailers like Pearle only to limit their supply chains to Luxottica brands. In 2014, a columnist at Forbes Magazine described Luxottica as a "four-eyed, eight-tentacled monopoly" that was driving consumer prices for eyewear higher.[3]

24.     In 2013, nearly 30% of all Pearle Vision stores (148 out of the 497 stores in the U.S.) were company-owned "corporate" stores. By 2022, only 12% of Pearle Vision stores (62 out of the 511 stores in the U.S.) were corporate stores.

25.     During the same time, Luxottica's derived revenue per franchise store, representing revenue from purchases that franchisees must make from Luxottica (excluding marketing and franchise fees), more than doubled from approximately $34,000 in 2014 to nearly $75,000 in 2022.

### Pearle Vision franchisees

26.     Luxottica purports to sell Pearle Vision franchisees "a premium optical retail brand that provides the systems and processes [they] need to help maintain strong margins and increase sales volume." Luxottica offers franchisees the exclusive right to operate Pearle Vision stores within their designated geographic area.

---

[3]     https://www.forbes.com/sites/anaswanson/2014/09/10/meet-the-four-eyed-eight-tentacled-monopoly-that-is-making-your-glasses-so-expensive/?sh=558f5ba46b66

27.     New franchisees' minimum investment to acquire a Luxottica franchisee is approximately $400,000 and can exceed $600,000.

28.     Luxottica provides a Franchise Disclosure Document to each prospective franchisee. These documents purportedly contain the disclosures required under federal law (*see, e.g.*, 16 C.F.R. § 436.1 *et seq.*) and applicable state law.

29.     When a prospective franchisee agrees to purchase a franchise, the franchisee and Luxottica enter into a Franchise Agreement.

30.     Many of Luxottica's franchisees are small businesspeople who have invested years of savings into the franchise.  Others are optical health professionals who owned successful independent practices before being lured into converting into a franchise with a promise of an "under one roof" approach to eyecare and retail with turnkey back-end systems and an established supply chain.

### An Overview of the Eyewear Industry and Vision Insurance

31.     The eyewear industry has several components. Retailers, like Pearle franchisees, sell glasses frames**,** prescription lenses, stock lenses, and contact lenses.  Stock lenses are mass-produced to pre-fit specific prescriptions and are generally used for lower-strength prescriptions.  The majority of lenses sold are stock lenses.  Prescription lenses are custom-manufactured and generally used for higher-level prescriptions.

32.     Pearle franchisees generally sell eyeglasses by allowing customers to select a frame from those displayed in their stores, often on a "frame board."  They then use either stock or prescription lenses to complete the glasses.

33.     Medical professionals, such as optometrists, or businesspeople generally own Pearle franchises. If a non-optometrist owns a Pearle franchise, the franchisee will often affiliate with an optometrist located within or next to the Pearle store.  The optometrist will then see patients and issue prescriptions that the Pearle franchise will often fill.

34.     Customers can pay for eyewear out-of-pocket or use vision insurance. Vision insurance provides coverage for individuals who enroll through their workplace or purchase it independently.  Once enrolled, patients can visit eye care professionals such as optometrists (ODs), ophthalmologists (MDs), or opticians for comprehensive eye exams, evaluations, and prescriptions. Patients can purchase their preferred glasses or contact lenses from retailers, such as Pearle franchisees, if corrective eyewear is needed.

35.     Vision insurance typically covers a portion of the cost of exams and eyewear. The insurance provider then reimburses the eye care professional or eyeglass store for the covered amount at a rate established through contracts between insurance companies and healthcare providers or vendors. The patient is responsible for paying the remaining balance, including deductibles, co-payments, or costs exceeding the insurance coverage.

36.     If an insured patient wants to fully utilize their insurance plan (*i.e.*, pay the smallest co-payment), they must use an "in-network" provider with their plan.  Therefore, insurance companies maintain directories of "in-network" providers from which their insureds can choose.  Out-of-network providers are not listed in the directory.

37.     When a patient receives a covered service or purchases a covered product, the provider or vendor submits a claim to the insurance company for reimbursement. The reimbursement rate represents the maximum amount the insurance company will pay for that specific service or product.

38.     An insurance agreement may provide different reimbursement rates for various provider programs based on the product provided to the customer. For example, insurers may pay different rates for single-vision lenses compared to bifocals.  Generally, insurers pay reimbursements for exams, frames, lenses, and contacts.

39.     An example of a rate sheet follows:

SCHEDULE 1.35

RATE SCHEDULE

| State | Practice | Signature | | | | Choice | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | Comp Exam | Single Vision Lens | Bifocal/ Progressive | Frame | Comp Exam | Single Vision Lens | Bifocal/ Progressive | Frame |
| All | Fees | $50.00 | $22.00 | $23.00 | $22.00 | $50.00 | $14.00 | $15.00 | $17.50 |

| State | Advantage | | | |
|---|---|---|---|---|
| | Comp Exam | Single Vision Lens | Bifocal/ Progressive | Frame |
| FL, PA & WV | 80% of U&C up to a max of $41.00 | $16.00 | $21.00 | 55% of allowance less copay |
| CO, GA, IA, IL, IN, KY, MI, MO, NH, OH, UT, VA & WI | 80% of U&C up to a max of $47.00 | $16.00 | $21.00 | 55% of allowance less copay |
| CT, MD, MN, NJ, NM, NY, OR, VT & WA | 80% of U&C up to a max of $50.00 | $16.00 | $21.00 | 55% of allowance less copay |

| Plan | Unique Advantage Plan Clients | | | |
|---|---|---|---|---|
| | Comp Exam | Single Vision Lens | Bifocal/ Progressive | Frame |
| Essentials (ACA) | 80% of U&C up to a max of $40.00 | $16.00 | $21.00 | 55% of allowance less copay |
| City of Passaic, BoE | 80% of U&C up to a max of $40.00 | $16.00 | $21.00 | 55% of allowance less copay |
| MPSERS | 80% of U&C up to a max of $40.00 | $16.00 | $21.00 | 55% of allowance less copay |

*Luxottica's Participation in the Vision Insurance Market and "Master Agreements" with VSP and Eyemed*

40.     Luxottica is a dominant player in the U.S. vision insurance market.  It owns EyeMed, "the second largest vision benefits company in the United States."[4]  EyeMed's primary vision insurance competitor is VSP.  VSP is the "largest vision benefits company in the U.S."[5]  VSP also owns eyeglass brands through a subsidiary, Marchon.  VSP-owned or licensed brands include Calvin

---

[4]  https://www.essilorluxottica.com/sites/default/files/documents/2021-05/ESSI_DEU_2020_MEL_UK_030521_0.pdf at 38.

[5]  https://www.vsp.com/about-vsp

Klein.[6]

41.     Becoming in-network providers for vision plans such as VSP and Eyemed provides competitive advantages for many Pearle franchisees.

42.     For instance, a store that accepts VSP in-network receives free marketing through the VSP directory. When one of the thousands of VSP insureds in that market needs a new pair of glasses and does not have an existing relationship with a provider, he will likely consult the VSP directory for an in-network provider. A Pearle Vision franchise that does not accept VSP in-network is at a competitive disadvantage from other optical retailers, including other Pearle Visions, that are listed in that directory. In that way, becoming an in-network vision care plan provider increases traffic to a store and provides a competitive advantage against those stores that do not participate in the vision care plans.

43.     Even though Eyemed and VSP are ostensible competitors, Luxottica, Eyemed, and VSP have agreed to the reimbursement rates that Eyemed and VSP will pay Pearle franchisees.

44.     In 2014, Luxottica and VSP entered a master agreement governing how VSP would treat Pearle franchisees.

45.     An article in "Vision Monday" described the arrangement:

> RANCHO CORDOVA, Calif. — VSP Vision Care (https://www.vsp.com/) has entered an agreement with Pearle Vision (http://www.pearlevision.com/), a division of Luxottica Retail (http://www.luxottica.com/en/retail-brands) (NYSE: LUX), to provide VSP members access to Pearle Vision stores throughout the U.S. and Puerto Rico as VSP network providers. VMail has learned that the phased rollout has begun and is expected to be completed early in the first quarter of 2015.

46.     The article further explained that "all Pearle locations were considered and offered as a provider under the Cigna Vision plan, so there has been a longstanding working relationship with

---

[6] https://www.mymarchon.com/Catalog/#/brand/US/en/

the majority of them," but this "new agreement will make Pearle Vision locations full in-network providers for VSP Vision Care."

47.     This "Master Agreement" has several components.

48.     First, it gives Luxottica control over which franchises can be in-network VSP insurance providers. Luxottica used that control to induce franchisees to allow Luxottica to control their supply of frames and lenses and selection of frames, a program called "Eyecon."  Specifically, Luxottica told franchisees they could only go in-network with VSP if they adopted Eyecon and then punished them if they left Eyecon by removing them from VSP's in-network program.

49.     For example, former franchisee Brave ended its participation in Eyecon but wished to remain an in-network provider with VSP.  Brave had a separate contract with VSP that did not reference Eyecon and required 90 days' notice of termination.  Once Brave ended its Eyecon participation, Luxottica immediately terminated its in-network status with VSP without the contractually required 90 days' notice.  Brave asked Luxottica to explain. In response, Luxottica employees told Brave that the VSP representatives were not "even aware of the Eyecon or Pearle VSP contract" and may not "be aware of the terms that VSP and PEARLE entered into back in December of 2014." "From what I understand and in full transparency of what has been consistently communicated, I believe you will be out of network as a result of your decision to opt out of Eyecon."

50.     Second, the Master Agreement stipulates that VSP will reimburse Pearle franchisees and [their associated optometrists] at lower rates than they could have received had they become independent retailers.

51.     Luxottica agreed to VSP's below-market reimbursement rates for its franchisees in exchange for, among other things, its ability to control its in-network VSP status and thereby induce franchisees to accept Eyecon.

52.     More broadly, the VSP relationship with Pearle franchisees seems markedly different

than what regular market forces would dictate. Typically, an insurer like VSP would want a more comprehensive network of providers to be more attractive to its potential customers and current insureds. Pearle franchisees represent hundreds of providers. Accordingly, Pearle franchisees, collectively, should be able to negotiate more favorable rates, or at least market rates, in exchange for being in-network with VSP. Instead, VSP is paying Pearle franchisees below market rates and terminating franchisees who did not use a separate product, Eyecon, that would be otherwise unrelated to the VSP-franchisee relationship.

53.     Those franchisees that want to participate in VSP but, like Brave, have been barred by Luxottica from doing so, experience lower traffic and fewer sales than their VSP-accepting counterparts.

54.     The lower reimbursement rates paid by VSP lead to higher consumer costs. In sum, the franchisee incurs costs in purchasing frames and lenses, labor, and franchise fees, among other things. VSP pays the franchisee reimbursements that only partially cover those costs, necessitating the franchises to charge higher prices to consumers. Specifically, the franchisee increases the price above the VSP "frame allowance."  That price increase requires the consumer to make a co-pay.  For example, if the VSP "frame allowance" is $200 but the frame is sold for $250, the consumer has a $50 co-pay.  This price increase harms non-insured consumers who must also pay the full, inflated price.

***Many Pearle franchisees purchased franchises believing they could buy from multiple suppliers and control their assortment of frames.***

55.     Until 2018, Pearle franchisees purchased franchises under the reasonable belief that they could buy inventory from multiple suppliers and control their frame assortment.

56.     Luxottica's Franchise Disclosure Documents and Franchise Agreements did not disclose to prospective franchisees that Luxottica could control their supply chain and the assortment of frames they selected.

57.     The FTC has issued regulations governing what franchisors must disclose in their

Franchise Disclosure Documents. The Federal Trade Commission's Franchise Disclosure Rule requires franchisors to "disclose" specific information in the franchise disclosure document and provide that document to prospective franchisees at least 14 days before they enter the franchise agreement.[7]

58.    The Disclosure Rule's purpose is to "prevent deceptive and unfair practices through pre-sale disclosure of material information necessary to make an informed purchasing decision and the prohibition of specified misrepresentations."[8] The "disclosure" must "present all material facts accurately, clearly, concisely, and legibly in plain English."[9] Franchisors must "[r]espond fully to each disclosure Item" and "if a disclosure Item is not applicable, respond negatively, including a reference to the type of information required to be disclosed by the Item."[10]

59.    Federal regulations also require quarterly updates to the franchise disclosure document to reflect material changes.[11] The franchisor should provide all quarterly updates available when it provides the disclosure document to prospective franchisees.[12]

60.    Franchisor sales material cannot contradict the required disclosures. It is an "unfair or deceptive act or practice" for a franchisor to "make any claim or representation, orally, visually, or

---

[7] 16 C.F.R. § 436.2(a).

[8] Statement of Basis and Purpose, 72 Fed. Reg. at 15,448, Bus. Franchise Guide (CCH) ¶ 6058.

[9] 16 C.F.R. § 436.7(d).

[10] 16 C.F.R. § 436.6(c).

[11] 16 C.F.R. § 436.7(b) ("The franchisor shall, within a reasonable time after the close of each quarter of the fiscal year, prepare revisions to be attached to the disclosure document to reflect any material change to the disclosures included, or required to be included, in the disclosure document. Each prospective franchisee shall receive the disclosure document and the quarterly revisions for the most recent period available at the time of disclosure").

[12] FTC's Franchise Rule Compliance Guide at 127. *See* https://www.ftc.gov/system/files/documents/plain-language/bus70-franchise-rule-compliance-guide.pdf ("Each prospective franchisee should receive, at a minimum, the current basic disclosure document and any prior quarterly updates available when the disclosure is made").

in writing that contradicts the information required to be disclosed …"[13]  Otherwise, "the disclosures required by the rule could be contradicted in oral sales presentations and rendered of little value without violating the rule."[14]

61.     FTC Disclosure Rule, Item 8, provides that a franchisor must disclose the franchisee's "obligations to purchase or lease goods" related to the franchisee's operations "from the franchisor or under the franchisor's specifications."  Specifically, Item 8 provides: "the franchisee's **obligations to purchase or lease goods**, services, supplies, fixtures, equipment, **inventory**, computer hardware and software, real estate, or comparable items **related to establishing or operating the franchised business** either **from the franchisor**, its designee, or suppliers approved by the franchisor or **under the franchisor's specifications**. Include obligations to purchase imposed by the franchisor's written agreement or the franchisor's practice" (emphasis supplied).

62.     Additionally, for each applicable obligation, the franchisor is to state:

    a.     "Whether the franchisor or its affiliates are approved suppliers or the only approved suppliers of that good or service";

    b.     "Whether the franchisor permits franchisees to contract with alternative suppliers who meet the franchisor's criteria"; and

    c.     "Whether the franchisor issues specifications and standards to franchisees, subfranchisees, or approved suppliers. If so, describe how the franchisor issues and modifies specifications."

63.     From 2013 through 2018, Pearle Vision franchisees reviewing the Franchise Disclosure Document and proposed Franchise Agreement would not have reasonably believed that

---

[13] 16 C.F.R. § 436.9(a).

[14] Disclosure Requirements and Prohibitions Concerning Franchising, 2004 WL 1945523, at *168 n.811 (internal quotations omitted).

Pearle would take control over their supply chain of frames and lenses much less control over the selection of their frames.

64.     In 2013, the Franchise Disclosure Document and Franchise Agreement provided that:

   a.   Franchisees could operate their laboratory to manufacture lenses or purchase lenses through an approved supplier.[15]

   b.   Franchisees could buy frame inventory from Luxottica or an approved supplier.[16]

   c.   Franchisees could request Luxottica approve new suppliers of lenses or frames and new products to sell.[17]

   d.   Franchisees could order new frames they selected "through an Approved Supplier in accordance with our Brand Standards." The specific "Brand Standards" were

---

[15] Franchise Disclosure Document at 42 ("Lens Preparation Equipment. To construct a Franchised Store or acquire a Corporate Conversion Store with a finishing lab, you will purchase lens preparation equipment from approved third-party suppliers. In our experience, our Pearle Vision Franchisees lease, rather than purchase, this equipment. We have an approved supplier, Gerber, who furnishes the required equipment for a lab. Gerber offers a $1 Purchase Option leasing program or a ten percent (10%) Buy-out Lease as outlined in the table below") ; Franchise Agreement § 12.3 ("12.3 Designated Supplier Status. If Franchisee desires, Franchisee may submit the Location for Pearle Vision's approval as a designated supplier ("Designated Supplier"). As a Designated Supplier, Franchisee may utilize its on-site laboratory services to supply Franchisee's identically-owned Pearle Vision franchise location(s) as outlined in the Manual or Supplement to the Manual. Franchisee agrees that Franchisee may not attempt to utilize Designated Supplier services for such locations without first obtaining Pearle Vision's prior written consent").

[16] Franchise Disclosure Document at 40 ("On an ongoing basis after your Franchised Store opens you will need to replenish your Initial Frame Assortment. You may do so by ordering your frames through an Approved Supplier in accordance with our Brand Standards ("Replenishment Inventory"); 46 ("Except as set forth below, We require you to purchase your inventory of optical products from a supplier We have approved (an "Approved Supplier") and to display and sell only merchandise approved by Us ("Pearle Approved Merchandise")").

[17] Franchise Disclosure Document at 47 ("If you wish for Us to add a new Approved Supplier or a new product to our list of Pearle Approved Merchandise, you must submit a request for approval of the third-party vendor to our franchise operations department and pay the Approved Supplier Fee. Within ninety (90) days of submission of all the information or documentation listed below, We will notify you of our decision"); Franchise Agreement § 12.1 ("Franchisee shall purchase that Additional Inventory from Pearle Vision or an approved supplier as outlined in this Section 12"); Franchise Agreement § 12.2 ("If Franchisee desires to offer optical products from sources that have not been previously approved by Pearle Vision, Franchisee must submit a written request, along with samples of the optical products or professional services, to Pearle Vision for approval").

not disclosed in the Franchise Disclosure Document.[18]

e.  Other than as provided in the Franchise Agreement, Luxottica could not "control or have access to Franchisee's funds or the expenditure thereof, or in any other way exercise discretion or control over the Franchise Business."[19]

65.  In 2014, the Franchise Disclosure Document provided that:

a.  Franchisees could operate their own laboratory to manufacture lenses or purchase lenses through an approved supplier.[20]

b.  Franchisees could buy frame inventory from Luxottica or an approved supplier, after Luxottica selected the initial frame assortment for new stores.[21]

c.  Franchisees could request Luxottica approve new suppliers of lenses or frames and new products to sell.[22]

d.  While the 2014 Franchise Disclosure Document and Franchise Agreement disclosed that, no earlier than March 15, 2015, Luxottica would be the sole source of frames and inventory via a supply chain program, it stated that Luxottica may allow franchisees to purchase some inventory from approved suppliers and, unlike the 2021 Franchise Agreement, did not provide that Pearle would "plac[e] all orders for Frames and automatically replenish[] any Frames Pearle Vision deems

---

[18] Franchise Disclosure Document at 40 ("On an ongoing basis after your Franchise Store opens you will need to replenish your Initial Frame Assortment. You may do so ordering your frames through an Approved Supplier in accordance with our Brand Standards").

[19] Franchise Agreement § 10.3(B).

[20] 2014 Franchise Disclosure Document at 26, 32; 2014 Franchise Agreement § 5.3.

[21] 2014 Franchise Disclosure Document at 31, 40; 2014 Franchise Agreement §§ 12.1-12.3.

[22] 2014 Franchise Disclosure Document at 33; 2014 Franchise Agreement § 12.2.

necessary ..."[23]

    e.    Other than as provided in the Franchise Agreement, Luxottica could "not control or have access to Franchisee's funds or the expenditure thereof, or in any other way exercise discretion or control over the Franchise Business."[24]

66.    In 2015, the Franchise Disclosure Document and Franchise Agreement provided that:

    a.    Franchisees could operate their own laboratory for the manufacture of lenses or purchase lenses through an approved supplier.[25]

    b.    Franchisees could, after Luxottica selected the initial frame assortment, replenish their own assortment with a minimum 55% Luxottica frames and sunglasses 15% Marchon frames and sunglasses, and 30% frames and sunglasses obtained from Approved Suppliers.[26]

    c.    Franchisees could request Luxottica approve new suppliers of lenses or frames and new products to sell.[27]

    d.    The Franchise Disclosure document referenced a "supply chain strategy" with a target implementation of June 30, 2016, and reserved the right to be the sole Approved Supplier of merchandise, but unlike the 2021 Franchise Agreement, did not provide that Pearle would "plac[e] all orders for Frames and automatically replenish[] any Frames Pearle Vision deems necessary ..."[28]

---

[23] 2014 Franchise Disclosure Document at 32; 2014 Franchise Agreement § 12.2.

[24] 2014 Franchise Agreement § 10.3(B).

[25] 2015 Franchise Disclosure Document at 24; 2015 Franchise Agreement § 5.3.

[26] 2015 Franchise Disclosure Document at 30, 37; 2015 Franchise Agreement §§ 5.3, 12.1.

[27] 2015 Franchise Disclosure Document at 31-32; 2015 Franchise Agreement § 12.2.

[28] 2015 Franchise Disclosure Document at 40, 77; 2015 Franchise Agreement § 12.2.

   e.   Other than as provided in the Franchise Agreement, Luxottica could not control or have access to franchisee's funds or the expenditure thereof, or in any other way exercise discretion or control over the business.[29]

67.   In 2016, the Franchise Disclosure Document and Franchise Agreement provided that:

   a.   Franchisees could operate their own laboratory for the manufacture of lenses or purchase lenses through an approved supplier.[30]

   b.   After Luxottica selected the initial frame assortment, Franchisees could replenish their own assortment by purchasing 90% of their inventory from Luxottica and 10% from an approved supplier. Luxottica also reserved the right to change the assortment of brands or SKUs.[31]

   c.   Luxottica was the sole approved supplier of frames, lenses, and lab services through the supply chain management system and reserved the right to be the sole supplier of any other required purchases. However, Luxottica could allow franchisees to purchase additional inventory from approved suppliers subject to Luxottica-imposed limits. Luxottica must have approved all inventory and each source.[32]

   d.   Franchisees could request Luxottica approve new suppliers of lenses or frames and new products to sell.[33]

---

[29]  2015 Franchise Agreement § 10.3(B).

[30]  2016 Franchise Disclosure Document, Item 7 "Lens Preparation Equipment," Item 8(5), (6); 2016 Franchise Agreement § 5.3.

[31]  2016 Franchise Disclosure Document, Item 8(3); 2016 Franchise Agreement § 12.1.

[32]  2016 Franchise Disclosure Document, Item 8(6); 2016 Franchise Agreement § 12.

[33]  2016 Franchise Disclosure Document, Item 8 "Alternate Supplier Approval;" 2016 Franchise Agreement § 12.1.

e. Franchisees agreed to Lab Service Management (use of specific labs for lab services), Frame Board Management (Luxottica manages a maximum of 80% of the frame capacity, including placing all orders for frames and automatically replenishing any frames Luxottica deemed necessary), and Lens Management.[34]

f. Other than as provided in the Franchise Agreement, Luxottica could not control or have access to a franchisee's funds or the expenditure thereof, or in any other way exercise discretion or control over the business.[35]

68. In 2017, the Franchise Disclosure Document and Franchise Agreement provided that:

a. Franchisees could operate their own laboratory to manufacture lenses or purchase lenses through an approved supplier.[36]

b. Luxottica selected the initial frame assortment, required franchisees to purchase all frames, lenses, and lab services from approved suppliers, and reserved the right to require all frames be purchased from Luxottica or its affiliates lim, it purchases from approved suppliers, and change the assortment of brands and SKUs.[37]

c. Luxottica was the sole approved supplier of frames, lenses, and lab services through the supply chain management system and reserved the right to be the sole approved supplier of any other required purchases but could allow franchisees to purchase additional inventory from approved suppliers subject to Luxottica-imposed limits. Luxottica must have approved all inventory and each source.[38]

---

[34] 2016 Franchise Agreement §§ 12.2-12.4, Schedule 1.16.

[35] 2016 Franchise Agreement § 10.3(B).

[36] 2017 Franchise Disclosure Document at 26, 37; 2017 Franchise Agreement § 5.3.

[37] 2017 Franchise Disclosure Document at 36; 2017 Franchise Agreement § 12.1.

[38] 2017 Franchise Agreement §§ 5.3, 12.

    d.   Franchisees could request Luxottica approve new suppliers of lenses or frames and new products to sell.[39]

    e.   Franchisees agreed to Lab Service Management (using specific labs for lab services), Frame Board Management (Luxottica manages a Luxottica-determined percentage of the frame capacity, including placing all frame orders and automatically replenishing any frames Pearle Vision deems necessary), and Lens Management.[40]

    f.   Other than as provided in the Franchise Agreement, Luxottica could not control or have access to a franchisee's funds or the expenditure thereof, or in any other way exercise discretion or control over the business.[41]

***Luxottica gradually took control of Pearle franchisees' supply chain and frame assortment with the eyecon system, promising it would benefit franchisees.***

69.    Before Eyecon's implementation, Pearle Vision franchisees had significant discretion regarding which frames they would stock for sale. Most franchisees sold 50-60% Luxottica frames and the remainder from non-Luxottica suppliers. The Class members' ability to purchase frames from non-Luxottica suppliers enabled them to curate their product selection based on customer demographics, taste, and demand. Further, many non-Luxottica frames consisted of less expensive frames, which are significant profit drivers for franchisees. Pearle Vision franchisees could also operate their own lens laboratories or purchase lenses from non-Luxottica laboratories.

70.    Pearle Vision introduced Eyecon to its franchisees around 2014 and effectively made its use mandatory in 2018. Eyecon is a point-of-sale software system "hooked up to [Pearle's] entire

---

[39] 2017 Franchise Disclosure Document at 38; 2017 Franchise Agreement § 12.1.

[40] 2017 Franchise Agreement §§ 12.2-12.4.

[41] 2017 Franchise Agreement § 10.3(B).

supply chain, including frames, lenses, pricing, and contact lenses distributors." Luxottica represented to franchisees that eyecon would offer an automated supply chain system: a sophisticated algorithm would anticipate and provide franchisees with supplies, such as frames, that they were most likely to sell based on the products the franchisee was selling.

71.     Luxottica's Guide to Frame Supply Chain Process (December 2019) states the "Pearle Planning Team" was supposed to "create brand assortments for each" individual franchisee based on "sales data from" the franchisee's store and "feedback provided" from the franchisee to "Territory Franchise Directors." Then "Frame SKU/style selections are made by the category brand managers located in Italy with guidelines maintained by the Pearle Planning Team." Once frames were sold, "new product [was] shipped to replace them."

72.     Once a year, as described in an internal document RTB Frame Recall, May 2019, Luxottica would "recall product from your EyeCare Center (ECC) to allow" franchisees to "get a fresh assortment" and remove "frames that have reached the end of their life cycle, excess frames that are not selling well in your location, or brands that are no longer part of the go-forward assortment."

73.     As for lenses, under the Eyecon system, Luxottica required Pearle franchises to purchase stock lenses from a Luxottica-owned laboratory in Dallas and prescription lenses from a limited catalog, which they then ordered from a select group of laboratories.

74.     Under the Eyecon system, Luxottica required Pearle franchisees to purchase contact lenses from a single supplier.

### Eyecon roll-out

75.     Once the VSP master agreement was in place in 2014, Luxottica began manipulating its franchisees by offering them in-network VSP insurance status only if they agreed to use Eyecon.

76.     Luxottica also arranged with VSP to terminate franchisees' status as in-network VSP providers if they stopped using Eyecon, even though the franchisees had separate agreements with

VSP that did not disclose Luxottica's termination power or even reference Eyecon. Specifically, the VSP-franchisee agreements purport to be individual agreements between VSP and the franchisee that do not reference the master agreement between VSP and Luxottica.

### *Luxottica's representations regarding Eyecon's operation*

77.     Luxottica promised — and continues to promise — that their control over inventory will benefit franchisees.

78.     For example, in a February 17, 2016 "Full-Service Program Update" internal memo to franchisees, Luxottica stated that "Eyecon," its "best-in-class supply chain, AcuityLogic Practice Management System and reporting" caused "frames" to "be replenished based on model stock, which is determined by best sellers and frame sales."

79.     In a June 2016 "Lens, Lab & Contact Lens Supply Chain" memorandum, Luxottica promised that its "Stock Lenses program offers best in class pricing, leading service levels, and consistent quality product for our brand."

80.     In the same memo, Luxottica also promised that "lens orders are transmitted to our OneNetwork router, which routes orders to our lab partners, and product is shipped within our service level commitments."

81.     In a June 22, 2017 "Assortment Updates" memo to franchisees, Luxottica stated that "[c]riteria used when reviewing individual assortments" were "special requests submitted via the survey, brand sales history, available new brands, and Trend insights from Brand Teams in Italy."

82.     In a 2018 "Q&A" document given to franchisees, a franchisee asked, "what happens to certain demographic areas that have high concentrations of ethnic people who need F-fit-type frames or special fits … do we turn away sales or how do we handle?" Luxottica answered that "[w]e are adding frames to the assortments to cover special demographic needs. The information the field teams feedback from interaction with the community is used to support the Italian buying team's

selection of frame assortments."

83.     In a March 30, 2018 "Eyecon Lens FAQs" internal memoranda, Luxottica stated that "Pearle Vision's Full-Service Rx Program is intended to simplify the vendor and order management process for Licensed Operators [franchisees] while leveraging the scale of the full network to get the best price possible.  The supply chain will include best-in-class providers."

84.     In a May 2019 internal document, Managed Frame Replenishments, Luxottica promised to regularly replenish franchisee frames "with the quantity and appropriate styles that fit your assortment.  This ensures your assortment is maintained at the appropriate quantity on hand, and it meets the needs of your EyeCare Center's patient demographic segments."

85.     In its current advertisements, Luxottica promises that it has "tremendous buying power that helps us secure deep discounts from vendors … allow[ing] Pearle Vision franchise owners to maintain strong margins on frames, lenses and contact lenses, and lab equipment.  Our inventory management system spots buying patterns at your stores and keeps top sellers stocked to help you sell more frames."

86.     Similarly, Pearle's "executive franchise summary" given to prospective franchisees states that "with more than 500 retail locations spanning North America, Pearle Vision wields strong buying power and leverage to help negotiate discounts from vendors."

87.     A May 2020 memo from Pearle to its franchisees stated, "The May assortment update is a refresh for most ECCs.  Criteria used when reviewing individual assortments follow brand sales history; available new brands; trend insights from brand teams in Italy."

88.     In its Franchise Disclosure Documents, Luxottica states that "Pearle Vision remains committed to providing genuine eye care" through "the highest quality products."

### *Eyecon operation and pricing*

89.     Franchisees on Eyecon were limited to frame brands owned or licensed by Luxottica.

These frames did not include many popular brands and styles that franchisees could have sold, including Tura, New York Eye, Ideal Optical, and Maui Jim.

90.     Eyecon frames were more expensive than franchisees could have purchased on their own. For example, Luxottica provided the following price list in April 2022 for certain frames through Eyecon.

| Commodity/Category /Brand | US Current eyecon Price | US New eyecon Price 4/10 | US Avg $ Change | US Avg % Change |
|---|---|---|---|---|
| Frames | $59.24 | $60.41 | $1.18 | 2.0% |
| Youth | $30.75 | $31.03 | $0.28 | 0.9% |
| Lacoste Children | $37.70 | $39.63 | $1.93 | 5.1% |
| Nike Jr | $46.17 | $45.64 | -$0.53 | -1.2% |
| Oakley Youth | $34.14 | $34.37 | $0.23 | 0.7% |
| Polo Prep | $25.63 | $25.68 | $0.05 | 0.2% |
| Ray-Ban Jr | $29.64 | $29.80 | $0.16 | 0.5% |
| Sferoflex Children | $12.25 | $12.25 | $0.00 | 0.0% |
| Vogue Jr | $22.17 | $22.28 | $0.11 | 0.5% |
| VOGUE JR V | $22.17 | $22.28 | $0.11 | 0.5% |
| Mens | $55.77 | $56.36 | $0.59 | 1.1% |
| Armani Exchange | $38.49 | $38.97 | $0.48 | 1.2% |
| Arnette | $12.25 | $12.25 | $0.00 | 0.0% |
| Brooks Brothers | $36.61 | $36.73 | $0.12 | 0.3% |
| Burberry | $74.22 | $75.72 | $1.50 | 2.0% |
| Bvlgari | $125.09 | $128.65 | $3.56 | 2.8% |
| Calvin Klein | $60.63 | $63.65 | $3.02 | 5.0% |
| Chaps | $22.90 | $22.98 | $0.08 | 0.4% |
| Coach | $47.29 | $48.05 | $0.76 | 1.6% |
| Columbia | $55.80 | $59.13 | $3.33 | 6.0% |
| Dolce & Gabbana | $80.44 | $81.68 | $1.24 | 1.5% |
| Emporio Armani | $40.97 | $41.41 | $0.45 | 1.1% |
| Ferragamo | $99.45 | $101.24 | $1.79 | 1.8% |
| Flexon | $63.38 | $64.98 | $1.60 | 2.5% |
| Giorgio Armani | $99.11 | $99.50 | $0.40 | 0.4% |
| Gucci | $133.60 | $138.65 | $5.05 | 3.8% |
| Nike | $69.19 | $70.79 | $1.61 | 2.3% |
| Oakley | $68.67 | $68.67 | $0.00 | 0.0% |

91.     Class members report, however, that the Luxottica prices represented a noticeable increase in previously available market prices. No longer could franchisees rely on multiple vendors offering competitive pricing, quality service, and discounts. Indeed, the use of Eyecon drove up operating costs significantly, because not only was inventory more expensive but, in some cases, 30% or more of the inventory franchisees were required to purchase from Eyecon was unsellable.

92.     Similarly, lenses provided through Eyecon were more expensive than franchisees could have purchased on their own.  For example, Luxottica provided the price list for various types of lenses in October 2019.

October 14, 2019

| POLYCARBONATE LENS | | | | | | HI INDEX 1.60 | | | | HI INDEX 1.67 | | | |
| Gross Price | | | | | | Gross Price | | | | Gross Price | | | |
| CLEAR | CLEAR w/ premium AR | POLARIZED SUN | TRANSITIONS™ w/ Premium AR | Clear Blue | BluTech™ (w/ Premium AR) | CLEAR | POLARIZED SUN | Clear Blue w/ Premium AR | TRANSITIONS™ | CLEAR | POLARIZED SUN | Clear Blue w/ Premium AR | TRANSITIONS™ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| - | - | - | - | - | - | $496 | $586 | - | $631 | $496 | $586 | - | $631 |
| $232 | $346 | $322 | $481 | $361 | $441 | $446 | $536 | $575 | $581 | $446 | $536 | $575 | $581 |
| $193 | $307 | - | - | - | - | - | - | - | - | - | - | - | - |
| - | - | - | - | - | - | - | - | - | - | - | - | - | $756 |
| - | - | - | - | - | - | $621 | $711 | - | $756 | $621 | $711 | - | - |
| $357 | $471 | $447 | $606 | $486 | $566 | $571 | $661 | $700 | $706 | $571 | $661 | $700 | $706 |

93.     But again, franchisees report that the same lenses were available to them from other vendors offering competitive pricing and loyalty discounts.

94.     The same is true for the Luxottica-required labs franchisees on eyecon must use. Most franchisees report that the service and quality provided by these labs pale in comparison to that of other independent labs and, in many cases, comes at a higher price.

**Luxottica has made tens of millions of dollars from Eyecon**

95.     Luxottica's imposition of Eyecon has increased its revenue by tens of millions of dollars.  In 2014, Luxottica's Franchise Disclosure Document reported that it made $33,036,000 in revenue "from the purchase of goods and services by our" franchisees.  Luxottica's 2016 Franchise Disclosure Document reported that it made $47,586,982 "from the purchase of goods and services by our" franchisees.  Luxottica's 2022 Franchise Disclosure Document reported that it made $74,488,577 in "revenues derived from the purchase of goods and services by our" franchisees — more than twice the amount of franchisee-derived revenue from 2014.[42]

---

[42]  2022 Franchise Disclosure Document at 26.

96.     Luxottica has squeezed more revenue out of its franchisees while the number of franchisees has remained relatively constant.  The 2016 Franchise Disclosure Document reported 412 franchisee-owned Pearle Vision stores.  The 2022 Franchise Disclosure Document reported 449 franchisee-owned Pearle Vision stores, an increase of 9%.  Yet, from 2016 to 2022, Pearle's annual revenue from its franchisees increased by approximately $25,000,000, an increase of 37%.

*Eyecon contracts*

97.     Several types of contracts may govern a franchisee's use of Eyecon, depending on when they signed their franchisee agreement and whether they have renewed or amended that original agreement.

98.     First, some Pearle franchisees have not yet entered into an agreement requiring the use of Eyecon.

99.     Second, some Pearle franchisees amended their original franchise agreements by entering into a Full-Service Conversion Addendum, a Full-Service Addendum #2, and a Full-Service Addendum #3.

100.    Full-Service Addendum #3 contains a "Pricing Promise," which states:

> b.  Pricing Promise.  Pearle Vision promises that any Frames purchased from Pearle Vision by Licensed Operator for its Full Service location will be discounted at rate equal to or better than, on a weighted average basis, the discounts available to similarly situated independent optical retailers.

101.    Full-Service Addendum #3 further provides that Luxottica is required to meet certain "service levels" for "Lab Services and Lens Management" as follows:[43]

| Measure | Definition | Target | Frequency of Measurement | Service Level Target | Commencement Date |
|---|---|---|---|---|---|
| Turn Time* | Means 95% of jobs received within 7 calendar days | 7 Calendar days | Measured Weekly, Reported Monthly | Less than 3 consecutive months above 7 days | 3 Months after supply chain launches |

---

[43]  March 11, 2016 Lens/Lab Service Level Agreements.

| % of jobs over 10 days* | This means the number of jobs received over 10 days divided by the total number of jobs | <3% | Measured Weekly, Reported Monthly | Less than 3 consecutive months above 3% | 3 Months after supply chain launches |
| Supplier quality rejects | This means the number of rejects divided by the total number of jobs | <4% | Measured Weekly, Reported Monthly | Less than 3 consecutive months above 3% | 3 Months after supply chain launches |

* Turn time excludes special orders and frame to come

102.    Full-Service Addendum #3 provides for a penalty for breach of the Lab Services and

Lens Management services levels, as follows:

> For each Full Service location, if Pearle Vision fails to meet any of the Lens/Lab SLAs as outlined in the Playbook, Pearle Vision will pay Licensed Operator a penalty for that location ("**Lens/Lab Penalty**") as a reduction to Licensed Operator's Royalty or as a credit to Licensed Operator's Consolidated Statement commencing in December 2016 and each December thereafter.

103.    A "Service Level Agreement" regarding Pearle's obligations to provide franchisees

with sufficient frames provides:

> 3.    **Service Level Agreements ("SLAs")**.  Pearle agrees to the SLAs shown below or it will pay Licensed Operator a penalty as further described below.
>
> a.    As negotiated with the National Franchise Advisory Council and required in Full-Service Addendum #2, Pearle Vision will meet the Frame service levels shown below ("**Frame SLAs**"):

| Measure | Definition | Target | Frequency of Measurement | Service Level Target | Commencement Date |
|---|---|---|---|---|---|
| Frames In Stock % | Means (Count of SKU's with model stock & Inventory on | >90% | Measured Weekly, Reported Monthly | Less than 3 consecutive months be below 90% | 3 Months after supply chain launches into store |

| | hand)/(Count of SKU's with model stock) | | | | |
|---|---|---|---|---|---|
| Frames Back Order % | Means (Ordered Units not filled)/(Total model stocks in store) | <10% | Measured Weekly, Reported Monthly | Less than 3 consecutive months above 10% | 3 Months after supply chain launches into store |
| Frames Unique SKU's to facing | Means (count of unique SKU's on hand)/(# of facings) | >95% | Measured Weekly. Reported Monthly. | Less than 3 consecutive months below 95% | 3 Months after supply chain launches into store. |

104.     Luxottica agreed to pay franchisees a penalty if it failed to meet the "Frames In Stock" target, as follows:

> 4.     If Pearle Vision fails to meet the Frames In Stock target shown above for 3 consecutive months, Pearle Vision will pay Licensed Operator a penalty according to the formula shown below ("**Frame Penalty**"):
>
> a.     (Targeted Minimum In-Stock Rate) - (Actual average In-Stock Rate) * (LO model stock quantity) * (Average LO cost of items out of stock) = Credit to LO
>
> For Example
> (90% - 85%) * 500 * $50 = $1,250
>
> b.     The Frame Penalty will be paid on Licensed Operator's consolidated statement for the month following determination of the Frame SLAs.

105.     Third, some Pearle franchisees entered into Franchise Agreements on or after 2018.

Those Franchise Agreements provided in section 12.5:

> 12.5     Pricing and Service Level Agreements. Pearle Vision promises to provide the Promise and Service Level Agreements described in the Manual, however, Licensed Owner agrees and acknowledges that Pearle Vision shall have the right to (a) offer the Promise and Service Level Agreements only to licensed owners that meet certain criteria, (b) pay Licensed Owner a penalty determined by Pearle Vision for failing to meet any or all of the Service Level Agreements as outlined in the Manual, and/or (c) change or discontinue the Promise and Service Level Agreements at any time without notice.

106. The "Promise and Service Level Agreements" are not defined in the Franchise Agreements and incorporate the promises and Service Level Agreements described in the Full-Service Addendum #3.

107. Additionally, Pearle's Franchise Disclosure Documents Item 11 in the 2018-2022 Franchise Disclosure Documents state that Luxottica must "automatically replenish" the franchisee's "Inventory Assortment and advise you on the best Inventory for your EyeCare Center (*see* Section 12 of the License Agreement)."

**Eyecon's harm to franchisees**

108. Eyecon has not lived up to Pearle Vision's promises. It does not operate as a true automated supply chain system under which an algorithm selects frames based on franchisees' customers' prior purchasers. Instead, Luxottica employees purportedly select frames provided to franchisees based on the franchisees' location's socio-economic characteristics. Put more simply, Pearle Vision sends franchises in wealthier neighborhoods more expensive frames to sell, without regard to the styles, colors, and sizes that actually sell in various stores. Additionally — and critically — under the Eyecon system, Pearle Vision selects 80-100% of the frames sold by its franchisees, meaning Pearle Vision has almost complete control over the franchisees' frame inventory.

109. Eyecon damages Pearle Vision franchisees in multiple ways.

110. First, Eyecon provides Pearle Vision franchisees with older, less fashionable, and sometimes discontinued Luxottica frames, reducing sales of higher-end frame brands whose customers are more style-conscious. Some evidence suggests Luxottica is routing newer frames to preferred franchisees or other franchise brands, such as LensCrafters. For example, one franchisee reported receiving years-old Tiffany frames from Eyecon instead of the latest styles, which lowered customer demand for that brand. Another franchisee reported receiving a Burberry frame in 2023 that had been discontinued in 2016 because the style was unpopular and poorly made. The frame was

unsellable, and the franchisee was forced to absorb the cost.

111. Second, Pearle Vision franchisees can no longer sell less expensive non-Luxottica frames, eliminating that franchisee's profit source.

112. Third, Eyecon does not account for the ethnic demographics of franchisees' customers. As a result, it does not provide franchisees with large numbers of East or South Asian customers with the "universal fit" frames suitable for those populations, further reducing franchisee sales.

113. Fourth, Pearle Vision franchisees are at a competitive disadvantage to other optical retailers who offer greater brand selection. Eyecon severely limits — or eliminates — a franchisee's ability to curate their product selection to customer demand. Eyecon selects the frames each franchisee will purchase by classifying the franchises into one of three store categories. The categories are based on the franchisee's surrounding socioeconomic circumstances. Eyecon then provides higher-priced frames to the stores categorized as "level one" and lower-priced frames, correspondingly, to the remaining levels. Some franchisees report that their cost of goods sold doubled when Eyecon was implemented because they were forced to purchase both the largely unsellable Eyecon selection and a more desirable, individualized selection specific to their customer base.

114. Fifth, Pearle Vision restricts franchisees' purchase of contact lenses to one supplier through Eyecon, with less favorable terms than franchisees can negotiate with the same supplier outside of Eyecon.

115. Additionally, in connection with Eyecon's implementation, Pearle Vision has forbidden franchisees from using their own or independent laboratories to prepare lenses and requires franchisees to use Luxottica-controlled laboratories. As a result, franchisees have to pay higher laboratory fees, often suffer from longer lens preparation time, which hampers competitiveness, and

have lost the benefit of their laboratory-related capital expenditures.

116. Pearle Vision's implementation of Eyecon led to widespread franchisee concern. In 2018, "nearly half" of franchisees formed the Pearle Vision Independent Franchise Associate because they were "concerned after their franchisor imposed new supply chain rules that require[d] them to purchase exclusively through their parent company, Luxottica."

### *AcuityLogic Point of Sale Participation and Problems.*

117. The franchise agreement requires franchisees to utilize a Luxottica-approved point-of-sale (POS) system. Earlier versions of the agreement did not specify which POS system a franchisee must use, but more recent versions require franchisees to use AcuityLogic, which a VSP subsidiary, Eyefinity, owns.

118. Luxottica and Eyefinity created a Pearle Vision instance of AcuityLogic, allowing Luxottica to access franchisees' sales and customer data. Beginning in 2014 and continuing through the present, the franchise agreement gives Luxottica a *license* to access and use the data; however, it does not give them ownership of the data. Indeed, each franchisee maintains a separate contract with AcuityLogic — to which Luxottica is not a party — and pays for its use directly.

119. Nevertheless, Luxottica personnel have testified that (unbeknownst to franchisees) all data a franchisee enters into AcuityLogic is stored in the "Pearle cloud" and belongs to Luxottica. AcuityLogic personnel have stated that only Luxottica can authorize AcuityLogic to migrate a franchisee's or former franchisee's data off AcuityLogic, meaning that Luxottica controls a franchisee's patient data, sales data, warranty information, and customer demographic information. The franchise agreements do not support or disclose Luxottica's ownership of such data.

120. On August 16, 2023, current and former Pearle Vision franchisees received an email from Jennifer L. Volk, Privacy Officer for Luxottica of America, notifying them of a data breach that occurred in March 2021. The email stated that as current or former franchisees, "Luxottica provided

certain services to your franchise(s) which required [Luxottica] to receive customer data owned by your organization."

121.    "On November 7, 2022, [Luxottica] learned through [their] proactive monitoring procedures that a file containing certain retail customer data was published in an online post [and] the file was likely obtained from [Luxottica's] systems in March 2021 and later shared without authorization."

122.    Luxottica's "review of the data determined that it is primarily limited to customer contact information including names, addresses, phone numbers, emails and/or dates of birth provided by certain customers who made a retail purchase." The data "may also include a [customer's] last eye exam date, prescription expiration date, and/or prescription type (*e.g.*, single vision, bifocal, contacts, reading)."

123.    Over 305 million individual records were stolen, affecting over 70 million customers.

124.    Luxottica has exposed customer data to several security incidents in recent years. In June 2020, Luxottica-owned Eyemed experienced a data breach involving the protected health information of 2.1 million patients. In August/September 2020, a ransomware attack shut down Luxottica's online operations in Italy and China. And in or around November 2020, nearly one million patients' data from brands such as LensCrafters and other Luxottica eye care companies was also exposed to a security breach related to the company's online scheduling platform.

125.    In this latest security breach, information provided to the Class members shows that all — or nearly all — of many of the Class members' customer data was subject to the breach. For instance, 4800 customers' records were stolen from Brave, encompassing the entire customer base of one of its stores.

## CLAIMS FOR RELIEF

### First Claim for Relief
#### (*Contract, Combination, or Conspiracy in Restraint of Trade in Violation of Sections 1 and 3 of the Sherman Act for Injunctive Relief*)

126. The Master Agreement agreed to by VSP, Pearle, and EyeMed is a horizontal agreement between VSP and EyeMed, both of which are competitors in the market to provide vision insurance and reimbursements for vision care and eyewear.

127. The Master Agreement and all associated agreements between VSP and Eyemed represent a contract, combination, and/or conspiracy within the meaning of Sections 1 and 3 of the Sherman Act.

128. Through the Master Agreement, VSP and Eyemed have agreed to artificially lower and fix the reimbursement rates paid to Pearle franchisees and their associated optometrists for vision care and eyewear. This purchase-price-fixing agreement is *per se* illegal under Sections 1 and 3 of the Sherman Act.

129. As a direct and proximate result of VSP and Eyemed's continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Class have suffered actual or threatened injury.

130. Plaintiffs and the Class seek an injunction prohibiting VSP and Eyemed from entering into, honoring, or enforcing any agreements that restrict the reimbursement rates paid to Pearle franchisees or their associated optometrists.

### Second Claim for Relief
#### (*Contract, Combination, or Conspiracy in Restraint of Trade in Violation of Sections 1 and 3 of the Sherman Act for Damages*)

131. The Master Agreement agreed to by VSP, Pearle, and EyeMed is a horizontal agreement between VSP and EyeMed, both of which are competitors in the market to provide vision insurance and reimbursements for vision care and eyewear.

132.     The Master Agreement and all associated agreements between VSP and Eyemed represent a contract, combination, and/or conspiracy within the meaning of Sections 1 and 3 of the Sherman Act.

133.     Through the Master Agreement, VSP and Eyemed have agreed to artificially lower and fix the reimbursement rates paid to Pearle franchisees and their associated optometrists for vision care and eyewear. This purchase-price-fixing agreement is *per se* illegal under Sections 1 and 3 of the Sherman Act.

134.     The Master Agreement (and any related agreements) are anticompetitive. The conspiracy to fix purchase prices adversely affected Pearle franchisees and their associated optometrists by depriving them of, among other things, the opportunity to receive higher reimbursement payments for vision care and eyewear.  Additionally, the Master Agreement caused consumers to pay higher prices for vision care and eyewear because Pearle franchisees and their associated optometrists were required to increase the amounts charged for vision care and eyewear to consumers to offset their increasing costs of business.

135.     As a direct and proximate result of VSP and Eyemed's continuing violations of Section 1 of the Sherman Act described in this Complaint, Plaintiffs and other members of the Class have suffered actual or threatened injury in an amount to be proven at trial.  These damages consist of having received artificially lowered and unreasonable reimbursements for vision care and eyewear.

### Third Claim for Relief
### (*Tying Agreement in Violation of Section 1 of the Sherman Act*)

136.     Before the implementation of Eyecon, Pearle franchisees could purchase frames from approved vendors of their choice.

137.     By 2018, Luxottica required that Pearle franchisees purchase all, or substantially all, of their inventory from Luxottica-owned or licensed brands through Eyecon.

138.     Luxottica required Pearle franchisees to convert to the Eyecon system by conditioning

their franchise renewals on implementing Eyecon, conditioning their participation in the VSP network on implementing Eyecon, and requiring that franchisees use Luxottica-controlled labs.

139.    At the time the 2013-2018 Pearle Franchisees became Pearle franchisees, they had no knowledge of a potential obligation to give Luxottica full control over the frames and lenses they sold. Therefore, those franchisees could not incorporate the costs of Luxottica's full control over their frames and lenses into their determination of the financial return on investment in a Pearle franchise.

140.    The 2013-2018 Pearle Franchisees were locked in as Pearle franchises for at least five and, more likely, ten years, and were forced to accept a material change in their business operations.

141.    Luxottica became the frames and lens supplier for the vast majority of the Pearle franchisees in the United States.

142.    Luxottica has made tens of millions of dollars by selling frames and lenses to the Pearle franchisees.

143.    The 2013-2018 Pearle Franchisees could not have reasonably anticipated that they would be required to purchase frames and lenses exclusively from Luxottica as Pearle franchisees.

144.    Luxottica has market power over Pearle franchisees to appreciably restrain competition in the market for frames and lenses.

145.    There is a substantial amount of commerce affected by Luxottica's conduct in requiring its franchisees to purchase Luxottica-controlled frames and lenses. There are approximately 400 franchisee-owned Pearle Vision stores in the United States as of 2023.

146.    Plaintiffs and similarly situated franchisees paid higher prices for frames and lenses as a result of this illegal tying agreement. These higher prices for frames and lenses resulted in reduced profits for Plaintiffs and similarly situated franchisees and higher costs for Pearle customers, including the customers at Plaintiffs' stores.

147.    Luxottica's requirement that Plaintiffs and similarly situated franchisees purchase

Luxottica-controlled frames and lenses constitutes an illegal tying arrangement, with the Pearle franchise serving as the tying product and the Luxottica-controlled frames and lenses identified in this Complaint as the tied product.

148.    Luxottica's requirement that Plaintiffs and similarly situated franchisees purchase Luxottica-controlled frames and lenses had an anticompetitive effect in the market for frames and lenses in an area encompassing all thirty-seven states in which Pearle Vision operates.  The tying arrangement involving Luxottica-controlled frames and lenses foreclosed other sellers of frames and lenses from selling to Pearle franchisees.

149.    But for Luxottica's requirement that Plaintiffs and similarly situated franchisees purchase Luxottica-controlled frames and lenses, Plaintiffs and similarly situated franchisees would purchase frames and lenses from non-Luxottica controlled suppliers.

### Fourth Claim for Relief
#### (*Breaches of Contract and the Implied Covenant of Good Faith and Fair Dealing*)

150.    Plaintiffs and the Class members each entered a franchise agreement with Luxottica.

151.    Plaintiffs and the Class members performed their obligations under their franchise agreements with Luxottica.

152.    Luxottica breached the franchise agreements.

153.    The franchise agreements state that a franchisee "may become a provider for managed vision care plans."  In fact, the 2015 agreement specifically states that a franchisee may become a provider for VSP.

154.    No iteration of the agreement states that Luxottica may dictate the managed vision care plans in which a franchisee may participate.

155.    Nevertheless, in practice, Luxottica controlled the managed care vision plans' relationships with franchisees through the master agreements that enabled Luxottica to dictate the

terms and terminate the franchisees' relationships at will.

156.    The 2013-2018 franchise agreements also stated that franchisees may control their own inventory selection.  However, the implementation of Eyecon effectively foreclosed this option by requiring franchisees to purchase all — or substantially all — of their inventory from Luxottica or Luxottica-controlled brands.

157.    All relevant versions of the franchise agreements also "grant[] to Pearle Vision a perpetual, worldwide, non-exclusive, irrevocable, and royalty-free license to use and share Customer Information for marketing, advertising, and any other legitimate business purpose related to the Pearle Vision System."  The license agreements define "Customer Information" as "any and all information or data pertaining to [franchisee's] customers that is provided or otherwise made available by a customer or by [franchisee] relating to a customer …"  Luxottica breached this provision by, among other things, allowing unknown third parties to access the class members' customer information for illegitimate and nefarious purposes.

158.    Plaintiffs and the Class members have been damaged by these breaches by (a) lost revenue and profit due to higher costs from Eyecon; (b) decreased sales and customer dissatisfaction with the quality and selection of inventory; (c) increased operational costs caused by the higher inventory prices and unsellable inventory; (d) inability to access competitive vendors and sell non-Luxottica brands appealing to the public; (e) loss of customer confidence; and (f) loss of proprietary and confidential information and trade secrets.

159.    The implied covenant of good faith and fair dealing in the Franchise Agreements requires the parties to act in good faith, "with faithfulness to an agreed common purpose and consistency with the justified expectations of the other party."[44]  Bad faith includes "the abuse of a

---

[44] RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981).

power to specify terms or interference with or failure to cooperate in the other party's performance."[45]

160.    Luxottica breached the covenant of good faith and fair dealing by the actions described herein and failed to act toward the agreed common purpose — the profitability and success of Pearle Vision franchises and the Pearle Vision brand.

161.    Plaintiffs and the Class members have been damaged by these breaches as set forth above.

**Fifth Claim for Relief**
**(*Fraudulent Misrepresentations and/or Omissions*)**

162.    Luxottica represented to many of the Class members — and specifically those who signed franchise agreements prior to 2018 — that they would have significant, if not complete, control over their inventory selection, lab use, and business operations.

163.    Luxottica failed to inform these Class members that Luxottica would soon become the sole source for a large majority of the franchises' inventory; that franchisees would be required to purchase unsellable frames from Luxottica without recourse; that franchisees would be prohibited from taking advantage of competitive offers and discounts for the same inventory they purchased from Luxottica; that the franchisees would be prohibited from using non-Luxottica labs for their lenses; and that the franchisees would be unable to sell many marketable and popular brands and styles as a result of Eyecon, among other things.

164.    These representations and omissions were of material information.

165.    Luxottica intended franchisees to rely on its omissions.  Luxottica provided Class members with the Franchise Disclosure Documents to encourage the purchase of a Luxottica franchise.

166.    Plaintiffs and the Class members justifiably relied on Luxottica's omissions.

---

[45] *Id.*

Franchisees acquired Luxottica franchises based on the omissions of material information from the Franchise Disclosure Documents.

167.    Plaintiffs and the Class members were damaged by Luxottica's omissions.  But for Luxottica's omissions, franchisees would not have spent the tens of thousands of dollars to open a franchise.

**Sixth Claim for Relief**
**(*Negligent Misrepresentations and/or Omissions*)**

168.    Luxottica, in the course of its business, supplied false information for the guidance of the Class members in the purchase and sale of Pearle Vision franchises.

169.    Luxottica represented to many of the Class members — and specifically those who signed franchise agreements prior to 2018 — that they would have significant, if not complete, control over their inventory selection, lab use, and business operations.

170.    These representations about the control of inventory, labs, and operations were material.

171.    Luxottica failed to exercise reasonable care or competence in communicating the information to the Class members.

172.    Luxottica intended franchisees to rely on their representations.

173.    Plaintiffs and the Class members justifiably and understandably relied on Luxottica's representations in the Franchise Disclosure Documents.

174.    Plaintiffs and Class members were damaged by their reliance on the Defendants' representations.

175.    These omissions were of material information.

176.    Luxottica intended franchisees to rely on its omissions.  Luxottica provided Class members with the Franchise Disclosure Documents to encourage the purchase of a Pearle Vision franchise.

177.     Plaintiffs and the Class members justifiably relied on Luxottica's omissions. Franchisees acquired Luxottica franchises based on the omissions of material information from the Franchise Disclosure Documents.

178.     Plaintiffs and the Class members were damaged by Luxottica's omissions. But for Luxottica's omissions, franchisees would not have spent the tens of thousands of dollars to open a Luxottica franchise.

**Seventh Claim for Relief**
(*Violation of R.C. 4165.01 et seq. – Deceptive Trade Practices*)

179.     Luxottica violated R.C. 4165.01 *et seq.* (Deceptive Trade Practices) when Luxottica:

- "Represent[ed] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have"[46]; and

- "Represent[ed] that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another."[47]

180.     Pearle Vision franchisees have been harmed by VSP's payment of below-market reimbursement rates. Other types of damages may be specific to certain subgroups of franchisees. Some franchisees may have been unable to sell their franchise, or sell for as much, due to Pearle Vision's requirement that new owners adopt Eyecon. Franchisees that renewed their franchise agreements after 2015 or otherwise agreed to adopt Eyecon under false pretenses have suffered Eyecon-related damages, such as lost sales due to carrying less popular inventory or increased lens-preparation fees charged by the Luxottica-owned lens laboratories. Franchisees who are still operating under pre-2015 agreements or have otherwise not adopted Eyecon have suffered from various measures Pearle Vision has used to "encourage" Eyecon adoption, including loss of marketing support

---

[46] R.C. 4165.02(7).

[47] R.C. 4165.02(9).

and loss of VSP in-network access.

181. The Class members have also been damaged by Luxottica's implementation and maintenance of cybersecurity and privacy measures that were knowingly, foreseeably, and demonstrably insufficient which was a direct and proximate cause of the theft of the Class members' customer information; failure to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures despite knowing the risk of cybersecurity incidents, which was a direct and proximate cause of the theft of the Class members' customer information; and failure comply with common law and statutory duties pertaining to the security and privacy of individuals transacting business with the Class members including duties imposed by the Federal Trade Commission Act, 15 U.S.C. 45, which was a direct and proximate cause of the theft of the Class members' customer information.

182. These statements, acts, or omissions actually deceived or had the tendency to deceive the Class members.

183. The deception was material in that it influenced franchisees' decision to purchase or renew their franchise agreements; discouraged the sale of the Class members' business; and/or deceived the Class members about the adequacy of Luxottica's data security and ability to protect the platform from a cyberattack.

184. The Class members have been or were likely injured as a result and seek all relief allowed by law, including injunctive relief and reasonable attorneys' fees and costs.

### Eighth Claim for Relief
#### (*Violation of R.C. 1334.01 et seq. – Business Opportunity Plans*)

185. Luxottica is a "Seller" as defined under the provisions of R.C. 1334.01(A) because it sells or leases a "business opportunity plan."

186. Luxottica franchises are "business opportunity plans" because they offer purchasers "an agreement in which a purchaser obtains the right to offer, sell, or distribute goods or services

under all of the following conditions: (1) the goods or services are supplied by the seller, a third person with whom the purchaser is required or advised to do business by the seller, or an affiliated person; (2) the purchaser is required to make an initial payment greater than five hundred dollars, but less than one hundred thousand dollars, to the seller or an affiliated person to begin or maintain the business opportunity plan; and (3) the seller makes any of the following representations: (a) that the purchaser will be provided with retail outlets or accounts, or assistance in establishing retail outlets or accounts, for the sale or distribution of the goods or services; (b) that the purchaser will be provided locations, or assistance in finding locations, for vending machines, electronic games, rack displays, or any other equipment or display for use in the sale or distribution of the goods or services; (c) that the purchaser can earn a profit in excess of the initial payment; (d) that there is a market for the goods or services;" or "(e) that there is a buy-back arrangement."[48]

187.    Luxottica has made "false or misleading statement or engage[d] in" a "deceptive or unconscionable act or practice" in violation of R.C. 1334.03(B), as set forth in Paragraphs 115 and 116 above.

### Ninth Claim for Relief
### (*Tortious Interference with Prospective Contractual and Business Relationships*)

188.    Plaintiffs and the Class members have prospective business relationships with not only current but prospective customers who desired to purchase vision eyewear and services.  Likewise, Plaintiffs and the Class members have or had prospective business relationships with vendors such as eyewear brands, managed vision care plans, and business support systems such as AcuityLogic.

189.    Luxottica was aware that Plaintiffs and the Class members had these prospective business relationships with customers and vendors.

190.    Pearle Vision intentionally took an improper action to prevent Plaintiffs and the Class

---

[48] R.C. 1334.01(D).

members from entering into or furthering business relationships with customers and vendors, as set forth above. Specifically, Luxottica took action, with knowledge that such action would substantially harm the franchisees and their businesses, to restrict Plaintiffs and the Class members from entering into or interfering with existing agreements with certain inventory vendors, labs, and managed vision care plans which Plaintiffs and the Class members had worked with in the past.

191.    Luxottica was not privileged to take such actions.

192.    Luxottica's actions caused Plaintiffs and the Class members to suffer damages.

193.    Franchisees have suffered tens of millions of dollars in actual damages — not including triple damages available under antitrust, DTPA, or franchise disclosure claims or punitive damages available in fraud claims.

### Tenth Claim for Relief
#### (*Negligence*)

194.    Luxottica owes numerous duties to the Class members, including exercising reasonable care in securing and safeguarding their customer information from a cyberattack; using reasonable and adequate security procedures that are compliant with industry standard practices; implementing processes to quickly detect a data breach and to timely act on warnings about data breaches, including promptly notifying Class member of a data breach.

195.    Luxottica knew or should have known the risks of collecting and storing customer information and the impact to the class members if their information were stolen. Indeed, Luxottica and related entities had been targeted by cyberattacks at least three times in the year prior to the breach, and therefore a data breach was reasonably foreseeable.

196.    Luxottica breached the duties it owes to the Class members in several ways, including failing to implement adequate security systems, protocols and practices sufficient to protect the class members' customer information from a cyberattack and thereby creating a foreseeable risk of harm; failing to comply with the minimum industry data security standards; and failing to timely and

accurately disclose to Class members that their customer information had been stolen.

197.    But for Luxottica's wrongful and negligent breach of the duties it owed to the Class members, their customer information would not have been stolen.

198.    The injury and harm that the Class members suffered was the direct and proximate result of Luxottica's negligent conduct and was foreseeable.

199.    As a direct and proximate result of Luxottica's negligence, the Class members have been injured as described herein and are entitled to damages in an amount to be proven at trial.  Class members' injuries include, but are not limited to, loss of good will with customers and increased competition for the Class members' customers.

### Eleventh Claim for Relief
### (*Negligence Per Se*)

200.    Luxottica's unreasonable and inadequate data security measures and failure to timely notify the class members of the theft of their customer information violates Section 5 of the FTC Act. The FTC Act, and Section 5 specifically, require businesses to institute reasonable data security measures and breach notification procedures, which Luxottica failed to do.

201.    Section 5 of the FTCA, 15 U.S.C. 45, prohibits "unfair … practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by businesses like Luxottica of failing to implement and use reasonable measures to protect platforms on which they collect Personal Identifiable Information.  Various FTC publications and orders also form the basis of Luxottica's duty.

202.    Luxottica violated Section 5 of the FTC Act by failing to use reasonable measures to secure the Class members' customer information and sensitive data and by not complying with applicable industry standards.  Luxottica's conduct was particularly unreasonable given the sensitive nature and amount of data Luxottica collected and stored and the foreseeable consequences of Luxottica's failure to protect the data.

203.     Luxottica's violation of Section 5 of the FTC Act constitutes negligence *per se*.

204.     The Class members are within the class of persons Section 5 of the FTC Act was intended to protect.

205.     As a direct and proximate result of Luxottica's negligence *per se*, the Class members have suffered and continue to suffer injury and are entitled to damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, Brave Optical, Inc., Western State Optical, Inc., and DH Retail, Inc., on behalf of themselves and the unnamed members of the Class similarly situated, hereby demand judgment in their favor against Defendant, Luxottica of America, Inc., f/k/a Luxottica Retail North America, d/b/a Pearle Vision, and pray that the Court:

1.      Issue an Order certifying the case as a class action, pursuant to Rules 23(b)(2), 23(b)(3) and 23(g) of the Federal Rules of Civil Procedure, certifying the Class as alleged and defined herein, and certifying the undersigned counsel as knowledgeable, experienced and adequate Class counsel pursuant to Rule 23(g)(1) and (4) who will fairly and adequately represent the interests of the Class.

2.      Grant declaratory relief and preliminary and permanent injunctive in favor of Plaintiffs and the Class members enjoining Defendant from continuing its anticompetitive practices and false and deceptive misrepresentations and material omissions as alleged herein.

3.      Award Plaintiffs and the members of the Class compensatory damages with respect to each claim for relief in an amount in excess of Five Million Dollars ($5,000,000.00) to be determined from the evidence introduced at trial in accordance with law.

4.      Award Plaintiffs and the members of the Class treble damages and/or punitive or exemplary damages as provided by law with respect to each claim for relief as to which treble damages and/or punitive damages are permitted by law, in an amount in excess of Five Million Dollars

($5,000,000.00) to be determined from the evidence introduced at trial in accordance with law.

5.       Award Plaintiffs and the members of the Class their costs and expenses of this action, including without limitation their reasonable attorneys' fees, together with pre-judgment and post-judgment interest at the maximum rate allowed by law.

6.       Award and grant such other and further relief as the Court may deem just and proper.

/s/ *Eric H. Zagrans*

Eric H. Zagrans (0013108)
(*Trial Attorney*)
ZAGRANS LAW FIRM LLC
1640 Roundwyck Lane
Columbus, Ohio 43065-8416
(440) 452-7100 (telephone)
(800) 261-2008 (facsimile)
eric@zagrans.com (e-mail)

JOHNSTON CLEM GIFFORD PLLC
1717 Main Street, Suite 3000
Dallas, Texas 75201
(214) 974-8000 (main telephone number)
(972) 474-1750 (facsimile)

**Kenneth C. Johnston**
(*pro hac vice* pending)
Texas Bar No. 00792608
(972) 424-1718 (direct telephone)
kjohnston@johnstonclem.com (e-mail)

**Catherine (Kate) Gaither**
(*pro hac vice* pending)
Texas Bar No. 24059793
(972) 424-1722 (direct telephone)
kgaither@johnstonclem.com (e-mail)

**Robert W. Gifford**
(*pro hac vice* pending)
Texas Bar No. 24093543]
(972) 424-1721 (direct telephone)
rgifford@johnstonclem.com (e-mail)

*Attorneys for Plaintiffs*

## JURY DEMAND

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38 of the Federal Rules of Civil Procedure, on all issues so triable.

/s/ *Eric H. Zagrans*

Eric H. Zagrans