UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

**BRAVE OPTICAL, INC.,** *et al.*,

        **Plaintiffs,**

        v.

**LUXOTTICA OF AMERICA, INC.,**

        **Defendant.**

Case No. 1:23-cv-793

JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

At its core, this is an antitrust case between eyewear sellers. Defendant Luxottica of America, Inc. (Luxottica), is a major player in the U.S. eyewear market. (Compl., Doc. 1, #8). Plaintiffs Brave Optical, Inc. (Brave); Western State Optical, Inc. (Western State); and DH Retail, Inc. (DH), are current or former franchisees with Pearle Vision, a brand Luxottica owns. (*Id.* at #2–3). They sued Luxottica on behalf of themselves and similarly situated franchisees, asserting claims under the Sherman Act, 15 U.S.C. § 1 *et seq.*; contract law; Ohio Revised Code §§ 1334.01 and 4165.01; and tort law. (Doc. 1, #36–48). The case is now before the Court on Luxottica's Motion to Dismiss the Complaint under Federal Rule of Civil Procedure Rule 12(b)(6), (Doc. 19), and its alternative Motion to Strike Class Allegations in Plaintiffs' Complaint under Federal Rules of Civil Procedure 12(f) and 23(d)(1)(D), (Doc. 21). For the reasons explained below, the Court rules on neither motion now. Rather, the Court **STAYS** this matter until the parties have completed their contractually required mediation.

## BACKGROUND[1]

Luxottica—a corporation headquartered in Mason, Ohio—"is a dominant player in the US eyewear retail market and the world's largest company in the eyewear industry, with a market capitalization of about $70 billion and annual revenues in the tens of billions of dollars," (Doc. 1, #3, 8). It owns "numerous eyeglass retailers, including LensCrafters, Pearle, Target Optical, and Sunglass Hut." (*Id.* at #8). It also owns Vogue Eyewear, Persol, Ray-Ban, Oakley, and Alain Mikli. (*Id.* at #8–9). And it "has licensed the right to sell eyewear from multiple brands, including Armani, Burberry, Chanel, Ralph Lauren, DKNY, Michael Kors, Versace, and Dolce & Gabbana." (*Id.* at #9). As part of this vision empire, Luxottica sells Pearle Vision franchisees the exclusive right to operate Pearle Vision stores within their geographic area. (*Id.*). Buying in requires a substantial financial investment—typically around $400,000, but sometimes over $600,000. (*Id.* at #10).

Luxottica also owns EyeMed, the second-largest vision benefits company in the U.S. (*Id.* at #12). Plaintiffs allege that Luxottica, EyeMed, and VSP—EyeMed's primary competitor—"have agreed to the reimbursement rates that EyeMed and VSP will pay Pearle franchisees," "[e]ven though EyeMed and VSP are ostensible competitors." (*Id.* at #12–13).

Luxottica's relationship with VSP is governed by a Master Agreement. (*Id.* at #13). The Master Agreement contains two provisions to which Plaintiffs specifically

---

[1] Because this matter comes before the Court on a motion to dismiss, the Court accepts the well-pleaded allegations in the Complaint as true. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). But in reporting the background here based on those allegations, the Court reminds the reader that they are just that—allegations.

2

object. First, it allows Luxottica to control which of its franchises are in-network providers with VSP—an advantageous categorization that allows for more sales opportunities—"even though franchisees have separate agreements with VSP that did not disclose Luxottica's termination power." (*Id.* at #14, 24–25). And Plaintiffs say Luxottica utilized that control "to induce franchisees to allow Luxottica to control their supply of frames and lenses and selection of frames, a program called 'Eyecon,'" by only allowing them to go in-network with VSP if they participated in Eyecon and removing them from VSP's in-network provider list if they left Eyecon. (*Id.* at #14). The franchisees did not want to participate in Eyecon without the inducement of in-network status with VSP because Eyecon prices "represented a noticeable increase in previously available market prices." (*Id.* at #27). "Indeed, the use of Eyecon drove up operating costs significantly, because not only was inventory more expensive but, in some cases, 30% or more of the inventory franchisees were required to purchase from Eyecon was unsellable." (*Id.*).

Second, the Master Agreement entitles Pearle franchisees and their associated optometrists to lower reimbursement rates from VSP than they would have received if they were independent retailers. (*Id.* at #14). And Plaintiffs say that "Luxottica agreed to VSP's below-market reimbursement rates for its franchisees in exchange for, among other things, its ability to control its in-network VSP status and thereby induce franchisees to accept Eyecon." (*Id.*).

Additionally, "Pearle franchisees purchased franchises under the reasonable belief that they could buy inventory from multiple suppliers and control their frame

3

assortment." (*Id.* at #15). But "Luxottica's Franchise Disclosure Documents and Franchise Agreements did not disclose to prospective franchisees that Luxottica could control their supply chain and the assortment of frames they selected." (*Id.*). And Plaintiffs say that failure to disclose such information violates various federal rules and regulations. (*Id.* at #15–23).

In short, Plaintiffs contend that Luxottica enriches itself at franchisees' expense by strong-arming franchisees into using Eyecon. And "Eyecon provides Pearle Vision franchisees with older, less fashionable, and sometimes discontinued Luxottica frames, reducing sales of higher-end frame brands whose customers are more style-conscious." (*Id.* at #32). That happens in part because Luxottica has near-complete control over franchisees' frame inventory and "sends franchises in wealthier neighborhoods more expensive frames to sell, without regard to the styles, colors, and sizes that actually sell in various stores." (*Id.*). And it prevents franchisees from selling less-expensive non-Luxottica frames, fails to account for customer demographics, "severely limits — or eliminates — a franchisee's ability to curate their product selection to customer demand," and restricts franchisees to buying contact and eyeglass lenses from a single supplier. (*Id.* at #33–34).

Luxottica also employs similar tactics to force franchisees to use its point-of-sale (POS) system. (*Id.* at #34). Recent Franchise Agreements "require franchisees to use AcuityLogic, which a VSP subsidiary, Eyefinity, owns." (*Id.*). As a result, "Luxottica controls a franchisee's patient data, sales data, warranty information, and customer demographic information. The franchise agreements do not support or

4

disclose Luxottica's ownership of such data." (*Id.*). And Luxottica experienced a data breach while franchisees' data was in its control, resulting in the theft of franchisees' customers' data. (*Id.* at #34–35).

Based on the facts described above, Plaintiffs filed an 11-count Complaint on behalf of themselves and similarly situated current and former franchisees. (Doc. 1). Brave is a former franchisee that owned two Pearle Vision franchises in Plano, Texas, from 2016 to 2022. (*Id.* at #2–3). And Western State and DH are current franchisees that own Pearle Vision franchises in Colorado Springs, Colorado, and Boston, Massachusetts, respectively. (*Id.* at #3).

The Complaint brings three claims under the Sherman Act (Counts 1, 2, and 3). (*Id.* at #36–39). It also brings six common-law claims—one for breaches of contract and the implied covenant of good faith and fair dealing (Count 4), one for fraudulent misrepresentations and omissions (Count 5), one for negligent misrepresentations and omissions (Count 6), one for tortious interference with business relationships (Count 9), one for negligence (Count 10), and one for negligence per se (Count 11). (*Id.* at #39–43, 45–48). And it brings two claims under Ohio statutory law (Counts 7 and 8). (*Id.* at #43–45).

In response to the lawsuit, Luxottica first sought to file certain documents under seal. (Doc. 17). After the Court granted that motion, (Doc. 18), Luxottica filed those documents, (Doc. 20), and on the same day moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6), (Doc. 19). It then separately moved to strike class allegations from the Complaint. (Doc. 21). After receiving an extension,

(*see* 3/8/24 Not. Order), Plaintiffs responded to both motions. (Docs. 25 (responding to the Motion to Strike), 26 (responding to the Motion to Dismiss)). And, after receiving their own extension, (*see* 4/8/24 Not. Order), Defendants replied in support of both motions, (Docs. 28 (Reply to Resp. to Motion to Dismiss), 29 (Reply to Resp. to Motion to Strike)).

Both motions are now ripe.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter ... to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). While a "plausible" claim for relief does not require a showing of probable liability, it requires more than "a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted). The complaint must allege sufficient facts to allow the Court to "draw the reasonable inference that the defendant is liable." *Id.* In other words, a plaintiff must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (quoting Fed. R. Civ. P. 8(a)(2)).

To meet this pleading standard, a complaint must contain "either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 275–76 (6th Cir. 2010) (citation omitted). And "conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Id.* at 276 (cleaned up). In short,

6

an action will be dismissed where "there is no law to support the claims made" or "the facts alleged are insufficient to state a claim." *Stew Farm, Ltd. v. Nat. Res. Conservation Serv.*, 967 F. Supp. 2d 1164, 1169 (S.D. Ohio 2013).

"In reviewing a motion to dismiss, [the Court] construe[s] the complaint in the light most favorable to the plaintiff, draw[s] all reasonable inferences in its favor, and accept[s] all well-pleaded allegations in the complaint as true." *Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306, 310 (6th Cir. 2021). But that does not mean the Court must take everything plaintiffs allege as gospel, no matter how unsupported. The Court may disregard "naked assertions" of fact or "formulaic recitations of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (cleaned up). And it has limited scope to consider materials outside the pleadings. *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023) ("Generally, in considering a motion to dismiss, the district court is confined to considering only the pleadings ... . However, the court may, in undertaking a 12(b)(6) analysis, take judicial notice of matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." (cleaned up)).

## LAW AND ANALYSIS

This case raises a host of interesting issues relating to the merits of Plaintiffs' various claims, both under the Sherman Act and otherwise. But the Court concludes that it need not reach them—at least not yet. That is because of an issue that precedes consideration of the merits. Specifically, Luxottica argues that Plaintiffs have violated their contractual obligations to engage in mediation—which the contracts at

7

issue make a condition precedent to suit. (Doc. 19, #114–15). Luxottica therefore says that "the Court should dismiss Plaintiffs' Complaint until the parties have engaged in mediation." (*Id.* at #114). And its Reply expands that argument to encompass either a stay or a dismissal. (Doc. 28, #894 ("The Court should enforce the pre-suit mediation requirement and dismiss or stay this case while Luxottica mediates individually with each Plaintiff."); #916 ("[T]he Court should dismiss Plaintiffs' Complaint or stay this action for their failure to abide by the mandatory pre-suit alternative dispute resolution provisions in the parties' contracts that require the parties to engage in mediation before filing a lawsuit.")).

For their part, Plaintiffs note that they "do not object to mediating this dispute." (Doc. 26, #628). But they say that "dismissal is both unnecessary and prejudicial—particularly given the statute of limitations defenses Luxottica has already raised." (*Id.*). They therefore contend that, "[a]t most, the Court should stay this proceeding pending completion of mediation." (*Id.*).

As explained below, the Court agrees that Plaintiffs were contractually bound to mediate their disputes with Luxottica before suing. And it concludes that a stay, rather than dismissal, is appropriate here. So the Court stays the case and does not rule on the Motion to Dismiss or the Motion to Strike.

**A.    The Mediation Provisions Apply.**

Each Plaintiff's License Agreement contains a mandatory pre-suit mediation provision. Western State's and DH's License Agreements both contain the following provision:

8

> **Mediation.** Except as otherwise specified in this Agreement, if any dispute arises between the parties concerning this Agreement, any related agreement, any Licensed EyeCare Center, the offer and sale of any Licensed Eye Care Center, or the relations between the parties, which cannot be settled through negotiation after diligent effort, before resorting to litigation the parties will first attempt in good faith to settle the dispute or claim by non-binding mediation conducted under the auspices and then-prevailing rules of the National Licensed Mediation Program (or, if that program is discontinued, under the auspices and then-prevailing commercial non-binding mediation rules of the American Arbitration Association). … The demanding party's duty to mediate will be deemed satisfied thirty (30) days after a mediation demand has been made if the non-demanding party fails to appear or participate in good faith in the mediation. … If Pearle Vision and Licensed Owner are still unable to reach an accord upon satisfaction of the parties' obligation to mediate as provided above, then either party may submit the matter to the courts for resolution.

(Doc. 20-4 § 20.1, #379–80; Doc. 20-5 § 20.1, #452). And the "except as otherwise specified" part refers to § 20.2 of Western State's and DH's License Agreements, which goes on to specify that certain disputes—those over failure to pay amounts owed, termination of the License Agreement, trademark matters, confidentiality issues, enforcement of noncompete covenants, and "any judicial proceeding in equity seeking temporary restraining orders, preliminary injunctions, or other interlocutory relief"—are not subject to the mediation requirement. (Doc. 20-4 § 20.2, #380; Doc. 20-5 § 20.2, #452–53).

Plaintiff Brave likewise agreed to several mediation provisions. The 2011 and 2013 License Agreements between Gutman Vision and Luxottica, which were assigned to Brave when it purchased its Pearle Vision franchises, (Doc. 20-2, #283; Doc. 20-3, #320), contain a substantially similar provision. (Doc. 20 § 20.1, #189; Doc. 20-1 § 20.1, #243–44). But the mediation provision in those two License Agreements states that the mediation requirement "applies only to disputes that are specific to

9

Franchisee and not to issues that affect franchisees of Pearle Vision generally." (Doc. 20 § 20.1, #189; Doc. 20-1 § 20.1, #243–44). That said, the mediation provision and clause detailing exceptions to it in Brave's 2015 Franchise Disclosure Document (FDD) omit that qualification and are identical to the corresponding provisions in Western State's and DH's License Agreements. (Doc. 20-6, §§ 20.1, 20.2, #518–19).

Finally, the FDDs that all three Plaintiffs received state (in all capital letters) that "THE LICENSE AGREEMENT REQUIRES YOU TO RESOLVE DISPUTES WITH US BY MEDIATION[.]" (Doc. 20-6, #492; Doc. 20-7, #521; Doc. 20-8, #547). Moreover, Western State's and DH's FDDs cross-reference mediation provisions in other agreements. (Doc. 20-7, #526, 529; Doc. 20-8, #553, 555). And they state that "[e]xcept for certain specified types of disputes, all other disputes that cannot be resolved through good faith discussions and negotiations will be submitted for non-binding mediation at a mutually agreed location." (Doc. 20-7, #526, 529; Doc. 20-8, #553, 555).

The Court finds that the mediation provisions discussed above apply here. Start with Western State and DH. This dispute concerns the propriety and legality of terms in the agreements that govern the franchisor-franchisee relationship, along with various aspects of the sale and operation of Pearle Vision franchises. Those issues are disputes "concerning th[e] Agreement … or the relations between the parties," (Doc. 20-4 § 20.1, #379–80; Doc. 20-5 § 20.1, #452), and thus fall within the terms of the mediation provision, even if they arise under the Sherman Act. *See, e.g.*, *RGOI ASC, LTD. v. Gen. Elec. Co.*, Case No. 18-12624, 2019 WL 1992436, at *3 (D.

10

Mass. May 6, 2019) ("[P]laintiffs' Sherman Act claim falls within the scope of the service agreements' valid dispute resolution provision, which makes mediation the ticket of admission to litigation, if such is to ensue."). And the claims are not based on failure to pay amounts owed, termination of the License Agreement, trademark matters, confidentiality issues, or enforcement of noncompete covenants. Nor do Plaintiffs exclusively seek equitable relief. So their claims are not within any of the exceptions to the mediation requirement. Accordingly, the mediation provisions in Western State's and DH's License Agreements obligate them to mediate before suing.

The same is true of Brave. Yes, the first mediation provisions to which Brave agreed state that the mediation requirement "applies only to disputes that are specific to Franchisee and not to issues that affect franchisees of Pearle Vision generally." (Doc. 20 § 20.1, #189; Doc. 20-1 § 20.1, #243–44). But Brave partially relies on the 2015 FDD, (Doc. 1 ¶ 66, #20–21), which contains no such qualification. So it is subject to the same mediation obligation as the other two Plaintiffs.

Accordingly, because "the [relevant] contractual agreement[s] [are] clear on [their] face[s]," the Court concludes that "Plaintiff[s] [were] required to mediate" before filing this lawsuit. *Gate Precast Co. v. Kenwood Towne Place, LLC*, No. 1;09-cv-113, 2009 WL 3614931, at *5 (S.D. Ohio Oct. 28, 2009); *CoMa Ins. Agency, Inc. v. Safeco Ins. Co.*, 526 F. App'x 465, 468 (6th Cir. 2013) ("Contract terms are generally to be given their ordinary meaning when the terms are clear on their face, and we will apply the plain language of the contract when the intent of the parties is evident

11

from the clear and unambiguous language in a provision."). And because they did not do so, that obligation remains outstanding.

**B.     A Stay Pending Mediation is Appropriate.**

Separately, the Court must decide how to enforce that outstanding obligation. Recall that Luxottica urges the Court to either dismiss or stay the case while the parties mediate. (Doc. 19, #114; Doc. 28, #894, 916). Plaintiffs, on the other hand, urge the Court to either let the case proceed or stay it. (Doc. 26, #629).

The Court agrees with Defendant, (Doc. 28, #894), that simply letting the case proceed apace would deprive Defendant of the benefit of the bargain it struck with Plaintiffs. Moreover, doing so would go against federal courts' well-established policy of encouraging nonjudicial dispute resolution. *E.g.*, *Fisher v. GE Med. Sys.*, 276 F. Supp. 2d 891, 894 (M.D. Tenn. 2003) ("[F]ederal policy favors arbitration in a broad sense, and mediation surely falls under the preference for non-judicial dispute resolution. Thus, agreements like [the parties' pre-suit mediation agreement] are to be encouraged."); *Whitestone Grp., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 2:15-cv-962, 2016 WL 1117595, at *3 (S.D. Ohio Mar. 21, 2016) ("The Court notes that alternative dispute resolution is a favored practice, and that strong presumptions exist towards avenues other than lengthy and costly litigation."). So the Court will not allow this case to proceed while the parties mediate.

That leaves the question of whether to stay or dismiss, a question committed to the Court's discretion. *Dominion Transmission, Inc. v. Precision Pipeline, Inc.*, No. 3:13cv442, 2013 WL 5962939, at *4 (E.D. Va. Nov. 6, 2013) ("The Court, when

12

confronted with a defendant's objection that the plaintiff failed to comply with a condition precedent, has the discretion to either stay or dismiss the case."); *United States ex rel. Northstar Founds., Inc. v. Satterfield & Pontikes Constr., Inc.*, No. 3:13-cv-2, 2013 WL 12137650, at *7 (N.D. W. Va. June 19, 2013) ("Agreements to mediate are not within the scope of the Federal Arbitration Act ('FAA'), 9 U.S.C. § 1, et seq., and, therefore, a stay is not mandatory."). The Court concludes that a stay is preferable to dismissal here. First, the "[t]he parties are only contractually bound to attempt to mediate in good faith before filing suit." *N. Carolina Eye Bank, Inc. v. High Energy Ozone, LLC*, No. 1:19cv614, 2019 WL 6730961, at *8 (M.D.N.C. Dec. 11, 2019). And the mediation provision grants the demanding party the right to file suit—or, here, to return to court—if the non-demanding party fails to appear or participate in good faith within 30 days of the mediation demand. (Doc. 20-4 § 20.1, #379–80; Doc. 20-5 § 20.1, #452; Doc. 20-6, § 20.1, #518). So "[g]ranting a stay puts the parties in the same position that they bargained for … and results in little or no prejudice to either party." *N. Carolina Eye Bank*, 2019 WL 6730961, at *8; *see also Kane Builders S & D, Inc. v. Maryland CVS Pharmacy, LLC*, No. Civ.A. 12-3775, 2013 WL 2948381, at *3–*4 (D. Md. June 13, 2013) (staying a case, rather than dismissing it, for the same reasons). Second, the Court expects that "mediation can be coordinated amongst the parties swiftly, with nominal delay to the entirety of the proceedings." *Swartz v. Westminister Servs., Inc.*, No. 810-cv-1722, 2010 WL 3522141, at *2 (M.D. Fla. Sept. 8, 2010). And, finally, "Plaintiffs do not object to mediating this dispute." (Doc. 26, #628); *N. Carolina Eye Bank*, 2019 WL 6730961, at *8 ("[T]he parties have previously

13

expressed a willingness to mediate ... in their respective briefs."). So the Court joins the many other courts that have stayed, rather than dismissed, cases in which "a plaintiff has initiated litigation without satisfying ... mediation requirements ... to allow for implementation of the agreed-upon dispute resolution mechanism." *Swartz*, 2010 WL 3522141, at *1 (collecting cases). Accordingly, it stays this case until the parties have completed the contractually required mediation.

## CONCLUSION

For the above reasons, the Court **STAYS** this case. It **ORDERS** the parties to engage in mediation as specified in their contractual agreements. And it **DIRECTS** the parties to submit a joint status report in 60 days.

**SO ORDERED.**

June 26, 2024
**DATE**

**DOUGLAS R. COLE
UNITED STATES DISTRICT JUDGE**