## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**BRAVE OPTICAL, INC., et al.,**

      **Plaintiffs,**

                            **Case No. 1:23-cv-793**

   **v.**

                            **JUDGE DOUGLAS R. COLE**

**LUXOTTICA OF AMERICA INC.,**

      **Defendant.**

### OPINION AND ORDER

Defendant Luxottica of America, Inc., (Luxottica) moves the Court to dismiss Plaintiffs Brave Optical, Inc.'s (Brave Optical) and Western State Optical, Inc.'s (Western State) Complaint (Doc. 1) or, in the alternative, to strike its class allegations. (Docs. 19, 21). For the reasons below, the Court **GRANTS** the former request and **DISMISSES** all of Plaintiffs' claims. And because it does so, the Court **DENIES** the latter request as **MOOT**.

### BACKGROUND[1]

Players in the vision-care industry don't always see eye-to-eye. At least that seems to be the case between Luxottica, which owns Pearle Vision (PV), a "premium

---

[1] Because this case is before the Court on a motion to dismiss, the Court accepts the well-pleaded allegations in the Complaint as true. *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). "But in reporting the background here based on those allegations, the Court reminds the reader that they are just that—allegations." *Brave Optical, Inc., v. Luxottica of Am., Inc.*, No. 1:23-cv-793, 2024 WL 3173504, at *1 n.1 (S.D. Ohio June 26, 2024).

optical retail brand," and its franchisees.[2] (Doc. 1, #8–9). Luxottica franchises the PV brand to small businesses like Brave Optical and Western State,[3] (*id.* at #10), along with a putative class of other PV franchisees they seek to represent, (*Id.* at #5 (class definition)). New PV franchisees believed they were buying into a business "that provide[d] the systems and processes [they] need[ed] to help maintain strong margins and increase sales volume." (*Id.* at #9 (second alteration in original)). But Plaintiffs allege that the practice, if not the theory, of being a PV franchisee was bleak. So bleak, in fact, that Luxottica's treatment of franchisees constituted a variety of contract breaches, antitrust violations, and torts. (*See generally id.*).

A nearly decade-long series of developments between Luxottica, the PV franchisees, and a third-party vision care provider (more on them later) underlies those allegations. (*See id.* at #15–23). And those developments revolve around the two documents that govern each PV franchisee's relationship with Luxottica: the Franchise Agreement (FA) and Franchise Disclosure Document (FDD). (*See id.*). In broad strokes, Plaintiffs allege that Luxottica progressively changed the terms of the FAs and FDDs, starting around 2014, to the franchisees' detriment. (*Id.*). And what's more, they allege that Luxottica didn't live up to its end of the bargain under the various terms it set over the years. (*See id.* at #39–48).

---

[2] Plaintiffs appear to use "Luxottica" and "Pearle Vision" interchangeably in their Complaint to refer to the same entity: their franchisor. (Doc. 1, #3). To avoid confusion, the Court will refer to Plaintiffs' franchisor solely as Luxottica.

[3] A third Plaintiff, DH Retail, Inc., is no longer part of this case. *See infra* note 5.

The specific deficiencies Plaintiffs allege with respect to the franchise terms and Luxottica's actions fall into three (sometimes interrelated) categories: (1) Luxottica's increasing control over franchisees' eyewear selections; (2) Luxottica's coordination with a third-party vision care plan provider to deflate franchisees' insurance reimbursement rates; and (3) Luxottica's failure to secure franchisees' customer data. (*See generally id.*). The Court will describe each in turn.

## A. Luxottica's Increasing Assertion of Control over Franchisees' Inventories.

PV franchisees enjoyed, for a time, the "significant discretion" to select their own eyewear suppliers and lens manufacturers (so long as the supplier or manufacturer was on Luxottica's approved list). (*Id.* at #23, 18 & n.16). That discretion enabled franchisees to "curate their product selection based on customer demographics, taste, and demand." (*Id.* at #23). In other words, Luxottica allowed franchisees—each of whom might serve different markets from others—to tailor their offerings to their customers' preferences. And perhaps more significantly, to achieve that tailoring franchisees could stock their shelves with "non-Luxottica frames"—that is, frames not belonging to one of the many brands Luxottica owns—which were "less expensive" and therefore "significant profit drivers for franchisees." (*Id.*).

That discretion didn't last. Starting in 2014, Luxottica began phasing in Eyecon, "an automated supply chain system … [that] would anticipate and provide franchisees with supplies, such as frames, that they were most likely to sell based on the products the franchisee was selling." (*Id.* at #23–24). At first blush, that sounds pretty good: PV franchisees would still receive a market-tailored selection of eyewear,

3

but without the hassle of identifying its own suppliers and assembling its own purchase orders. Luxottica's Eyecon system would handle all of that tedium. (*See id.* at #24–26).

But there was a catch: "Franchisees on Eyecon were limited to frame brands owned or licensed by Luxottica." (*Id.* at #26). That restriction had a double impact. First, it reduced franchisees' profit margins on a per-frame basis, since Luxottica frames were generally costlier at the wholesale level than non-Luxottica frames. (*Id.* at #27, 33). Second, Eyecon's frame selections weren't particularly marketable, since they were selected based solely on "the franchisees' location's socio-economic characteristics" instead of on the franchisees' own sales history or other more specific customer demographic characteristics. (*Id.* at #32–33). Moreover, the frames that Eyecon *did* select were "older, less fashionable, and sometimes discontinued …, reducing sales of higher-end frame brands whose customers are more style-conscious." (*Id.* at #32). And "[s]ome evidence suggests [that] Luxottica is routing newer frames to preferred franchisees or other franchise brands." (*Id.*). So at bottom, Eyecon "has not lived up to [Luxottica's] promises" that it would be a boon to franchisees. (*Id.*).

Eyecon's rollout was also a surprise to preexisting franchisees, whose franchise agreements allegedly "did not disclose … that Luxottica could control their supply chain and the assortment of frames they selected." (*Id.* at #15). But there were signs. From 2013 to 2017, the FDDs provided to prospective franchisees grew progressively more restrictive. The 2013 FDD allowed franchisees to "buy frame inventory from

4

Luxottica or an approved supplier." (*Id.* at #18). But by 2017—and with multiple incrementally more restrictive modifications in between, (*see id.* at #19–22)—the FDD provided that "Luxottica selected [the franchisee's] initial frame assortment, required franchisees to purchase all frames, lenses, and lab services from approved suppliers, and reserved the right to require all frames be purchased from Luxottica … and [to] change the assortment of brands and [frames]." (*Id.* at #22). Still, the furthest Luxottica went, until 2018, was to "reserve[] the right" to exert continuing unilateral control over franchisees' inventories. (*Id.* at #20–22). But then, sometime in 2018, Luxottica "effectively made [Eyecon's] use mandatory" for franchisees. (*Id.* at #23–24, 32). That is, Luxottica conditioned franchisees' renewals on participation in Eyecon.[4] (*Id.* at #37–38).

**B.    Luxottica's Coordination with VSP, a Vision Insurer, to Deflate Franchisees' Reimbursement Rates.**

Luxottica's increasing control over franchisees allegedly didn't stop at inventory management, but extended to franchisees' ability to contract with third-party vision insurance providers.

Much like other forms of health service, vision care can be paid for "out-of-pocket or us[ing] vision insurance." (*Id.* at #11). To get the most out of their insurance, customers must use "in-network" vision care providers. (*Id.*). Insurance companies

---

[4] The extent of each PV franchisee's obligation to use Eyecon depends on "when they signed their franchise agreement and whether they have renewed or amended that original agreement." (*Id.* at #29). So while *some* PV franchisees must use Eyecon, others—for example, those that signed their franchise agreements before 2018 and haven't yet come up for renewal—ostensibly are not obliged to do so.

"maintain directories of 'in-network' providers from which their insureds can choose." (*Id.*).

And it pays for a vision care provider to be in-network with an insurer. (*See id.*). In-network providers "receive[] free marketing through the [insurer's] directory," since customers needing eyewear "will likely consult [their insurer's] directory for an in-network provider." (*Id.* at #13).

It pays especially well to be in-network with the "largest vision benefits company in the U.S.": VSP. (*Id.* at #12 (citation omitted)). VSP, though unaffiliated with Luxottica (or Luxottica's own vision-insurance subsidiary, EyeMed), contracted with Luxottica to bring PV franchisees into its network. (*Id.* at #12–14).

The "master agreement" between Luxottica and VSP had two components. First, it gave Luxottica control over which PV franchisees could be in-network providers for VSP. (*Id.* at #14). Luxottica allegedly used that authority as another way to get franchisees to use Eyecon (in addition to conditioning franchise renewal on Eyecon participation, as described above). (*Id.*). Second, and more importantly for this case, the master agreement allowed VSP to offer "below-market reimbursement rates" to Luxottica's PV franchisees. (*Id.*). In other words, Luxottica and VSP agreed that VSP would pay out insurance claims to in-network Luxottica franchisees at rates lower than an in-network PV franchisee would have received from VSP on the open market (i.e., if the franchisee had been an independent shop, rather than a Luxottica franchisee). (*Id.* at #14–15). Putting those two pieces together, Plaintiffs allege that "Luxottica agreed to VSP's below-market rates for its franchisees in exchange for,

6

among other things, its ability to control [the franchisees'] in-network VSP status and thereby induce franchisees to accept Eyecon." (*Id.* at #14).

## C.    Luxottica's Failure to Maintain Customer Data Security.

Finally, one provision of the PV franchisees' franchise agreement also requires them to use a "Luxottica-approved point-of-sale (POS) system" in their day-to-day operations. (*Id.* at #34). That system collected "retail customer data" including "names, addresses, phone numbers, emails and/or dates of birth" as well as a customer's "last eye exam date, prescription expiration date, and/or prescription type." (*Id.* at #35).

The franchise agreement also gave Luxottica a "license to access and use the data." (*Id.* at #34 (emphasis omitted)). Though it didn't give Luxottica "ownership of the data." (*Id.*). But "own" the data is exactly what Plaintiffs allege Luxottica did. According to Plaintiffs, "Luxottica personnel have testified that … all data a franchisee enters into [the POS system] is stored in the 'Pearle cloud' and belongs to Luxottica." (*Id.*). Moreover, "only Luxottica can authorize [the system] to migrate a franchisee's or former franchisee's data …, meaning that Luxottica controls a franchisee's patient data, sales data, warranty information, and customer demographic information." (*Id.*).

Luxottica's centralization of customer data into its own cloud led to a data breach. "On November 7, 2022, Luxottica learned … that a file containing certain retail customer data was published in an online post and the file was likely obtained from Luxottica's systems." (*Id.* at #35 (cleaned up)). As a result, "[o]ver 305 million

individual records were stolen, affecting over 70 million customers." (*Id.*). That number encompasses "all—or nearly all—of many [franchisees'] customer data." (*Id.*).

*    *    *

Based on those allegations, the named Plaintiffs sued on behalf of themselves and a putative Rule 23 class comprising "current and former franchisees who entered into or acquired a Pearle Vision franchise agreement dated in any year from 2013 through 2023, inclusive." (*Id.* at #5). They advance eleven claims, which generally fall into four buckets: (1) federal antitrust claims under the Sherman Act (Counts 1–3); (2) a breach-of-contract claim (Count 4); (3) state-law statutory claims for violations of Ohio's Deceptive Trade Practices Act (DTPA) and Business Opportunity Plans Act (BOPA) (Count 7–8); and (4) common-law tort claims for negligent or fraudulent misrepresentation, interference with business relationships, and negligence in maintaining customer data privacy (Counts 5–6, 9–11). (*Id.* at #36–48).

After the parties fully briefed the motions under consideration here, the Court stayed the case and ordered all three Plaintiffs to separately mediate their claims with Luxottica as their contracts required. (*See* Op. & Order, Doc. 31; Order, Doc. 36). After the three mediations concluded, the parties informed the Court that DH Retail, Inc., would dismiss its claims with prejudice,[5] while the two other Plaintiffs would "proceed as putative class representatives." (Doc. 38, #990).

---

[5] Though DH Retail didn't file a separate stipulation dismissing its claims against Luxottica, the Court interprets the parties' Third Joint Status Report (Doc. 38) as such a stipulation and **DISMISSES** DH Retail, Inc., as a party from this case under Federal Rule of Civil Procedure 21.

With the required mediations completed and the motions fully briefed, (Docs. 25, 26, 28, 29), the matter is now ripe for the Court's review.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must allege "sufficient factual matter ... to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). While a "plausible" claim for relief does not require a showing of probable liability, it requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* The complaint must allege sufficient facts for the Court "to draw the reasonable inference that the defendant is liable." *Id.* In other words, a plaintiff must provide a "short and plain statement of the claim showing that the pleader is entitled to relief." *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (quoting Fed. R. Civ. P. 8(a)(2)).

To meet this pleading standard, a complaint must contain "either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 275–76 (6th Cir. 2010) (citation omitted). And "conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *Id.* at 276 (citation omitted). In short, a court will dismiss an action when "there is no law to support the claims made" or "the facts alleged are insufficient to state a claim." *Stew Farm, Ltd. v. Nat. Res. Conservation Serv.*, 967 F. Supp. 2d 1164, 1169 (S.D. Ohio 2013).

"In reviewing a motion to dismiss, [the Court] construe[s] the complaint in the light most favorable to the plaintiff, draw[s] all reasonable inferences in its favor, and

accept[s] all well-pleaded allegations in the complaint as true." *Keene Grp., Inc. v. City of Cincinnati*, 998 F.3d 306, 310 (6th Cir. 2021). But that does not mean the Court must take everything plaintiffs allege as gospel, no matter how unsupported. The Court may disregard "naked assertions" of fact or "formulaic recitations of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (cleaned up). And it has limited scope to consider materials outside the pleadings. *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023) ("Generally, in considering a motion to dismiss, the district court is confined to considering only the pleadings .... However, the court may, in undertaking a 12(b)(6) analysis, take judicial notice of matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint." (cleaned up)).

## LAW AND ANALYSIS

As noted, Plaintiffs' claims here run the gamut from antitrust, to breach of contract, to alleged Ohio statutory violations, to common-law tort claims. But the claims have one thing in common—Defendants have moved to dismiss them all. The Court takes them in the order set forth above, but ultimately agrees with Defendant as to each category of claims.

### A. The Sherman Act Claims Are Time-Barred.

Plaintiffs bring two antitrust claims under the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 et seq.[6] Luxottica argues that those claims are time-barred by the

---

[6] While the Complaint lists three counts of Sherman Act violations, the Court construes Counts 1 and 2 as a single claim. Those two Counts seek two different kinds of relief

relevant statute of limitations because the alleged wrongs—embodied in the terms of its master agreement and the franchise agreements—occurred outside the relevant limitations period. (Doc. 19, #116–18). Plaintiffs concede that the original violations fall outside the limitations period, but contend that the "continuing violation" doctrine saves their claims. (Doc. 26, #630–32). For the reasons explained below, Luxottica has the better argument.

Start with the alleged violations. Both claims arise under Section 1 of the Sherman Act, which prohibits "[e]very contract, combination …, or conspiracy, in restraint of trade or commerce." 15 U.S.C. § 1. The two claims differ as to the contract they attack. Plaintiffs' first antitrust claim identifies the 2014 master agreement between Luxottica and VSP as the "contract … in restraint of trade." (*See* Doc. 1, #36–37). Specifically, Plaintiffs argue that the master agreement constitutes an unlawful "horizontal agreement" between competitors to fix vision care reimbursement rates that Luxottica franchisees receive. (*Id.* at #36). The second claim points to the franchisees' own franchise agreements with Luxottica. (*See id.* at #37–39). The franchisees allege that those contracts constitute unlawful "tying agreements" that condition franchise ownership (the tying product) on purchasing inventory (the tied products) exclusively through Eyecon. (*Id.* at #38–39).

Both Sherman Act claims are subject to the four-year statute of limitations that applies to antitrust claims generally. 15 U.S.C. § 15b. So if an aggrieved plaintiff

---

(injunctive relief for Count 1 and damages for Count 2) for the same alleged antitrust violation. (*See* Doc. 1, #36–37).

fails to file suit within four years of the alleged antitrust violation, he's out of luck. *See Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 338 (1971). And violations accrue (i.e., the limitations period begins running) "when a defendant commits an act that injures the plaintiff's business." *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1021 (6th Cir. 1999) (citing *Zenith*, 401 U.S. at 338).

That said, the general four-year rule has a "continuing violation" exception. *Grand Rapids Plastics, Inc. v. Lakian*, 188 F.3d 401, 406 (6th Cir. 1999). When a defendant "repeatedly invad[es]" a plaintiff's interests by violating the antitrust laws with a series of overt violations, the statute of limitations begins running anew with respect to each violation upon its commission. *DXS, Inc. v. Siemens Med. Sys., Inc.*, 100 F.3d 462, 467 (6th Cir. 1996). Importantly, though, when a plaintiff merely suffers the "ripples," or consequences, of a single previous violation, the clock keeps ticking down from the commission of the original act giving rise to those ripples. *Z Techs. Corp. v. Lubrizol Corp.*, 753 F.3d 594, 600 (6th Cir. 2014).

Whether Plaintiffs plausibly alleged a series of continuing overt wrongs, as opposed to mere ripple effects of a single past act, makes all the difference in this case. That is because all agree that the genesis of the two antitrust claims lies either with the 2014 master agreement between Luxottica and VSP (Counts 1 & 2), or each franchisee's FA (Count 3), respectively. (Doc. 19, #116; Doc. 26, #631–32). Furthermore, they agree that both agreements predate the limitations period that applies to this case. But that's as far as their agreement goes. In Luxottica's view, the signing of those documents is where its "overt acts" began and ended. (Doc. 19, #116;

Doc. 28, #897). And since the master agreement and both Plaintiffs' FAs far predate the limitations period, Luxottica argues the claims are time-barred. (Doc. 19, #116–17). But in Plaintiffs' view, the signing of those documents kicked off an unceasing torrent of newly arising antitrust violations. According to them, "each time a franchisee was forced to accept a lower reimbursement rate [under] the Master Agreement or forced to pay higher inventory prices ... as a result of ... Eyecon," a new antitrust violation occurred. (Doc. 26, #632).

So here's where things stand: assuming—without deciding—that the master agreement and the FAs violate the Sherman Act, the question for the Court is whether the later transactions predicated on those agreements were independent, overt acts, or mere unabated, inertial consequences of a past act. *Siemens Med. Sys.*, 100 F.3d at 467–68. And on that question, the Court concludes that, under Sixth Circuit caselaw, the only overt violations Plaintiffs plausibly allege are the master agreement and the FAs themselves, not the later transactions predicated on those agreements.

Start with the master agreement between Luxottica and VSP. In *Grand Rapids*, the Sixth Circuit confronted a materially similar arrangement. There, the plaintiff alleged that it was victimized by an agreement between one of its competitors and a business partner, leading the plaintiff to lose out on further contracts with its partner. 188 F.3d at 404–06. The plaintiff argued that "each payment" from its competitor to its partner "was an independent wrongful act that started the statute of limitations running." *Id.* at 406. But the court explained that "the individual

13

payments … were only a manifestation of the previous agreement … [that] do not constitute a 'new and independent act,' as required to restart the statute of limitations." *Id.* Substitute "individual payments" with the alleged "artificially lower[ed] … reimbursement rates" here—i.e., the continuing harm Plaintiffs allege they suffer under the master agreement, (Doc. 1, #36)—and you have this case. That is, the rates that VSP paid to PV franchisees weren't self-contained, independent acts—rather they were "manifestation[s] of" VSP's eleven-year-old agreement with Luxottica.[7] *Grand Rapids*, 188 F.3d at 406; *see also In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009) (explaining that a defendant's "final act to effectuate [the alleged] conspiracy occurred" when it agreed with its competitors to fix prices, not when the plaintiffs suffered the conspiracy's "rippling effect[s]").

The FAs are much the same. To refresh, Brave Optical entered its franchise agreement on June 28, 2016, while Western State did so on November 14, 2019.[8] (Doc.

---

[7] Although the master agreement between Luxottica and VSP dates to 2014, (Doc. 1, #13), it came to directly affect a given franchisee only when that franchisee entered the PV franchise. Here that was June 2016 and November 2019, respectively, for the two plaintiffs. *See infra* note 8. In a sense, the franchise agreement "incorporates" the master agreement—the latter comes into force as a direct consequence of the former. So it's arguable that both of Plaintiffs' antitrust claims (i.e., the claim predicated on the master agreement, as well as the claim predicated on the franchise agreement) accrued when they signed their FAs, years after the Luxottica and VSP first entered into the master agreement. But even assuming that is so— a position no party advances—the result is the same. As explained shortly, both Plaintiffs brought suit more than four years after signing their FAs, meaning that the statute of limitations expired.

[8] These dates are drawn from Luxottica's motion. (Doc. 19, #116). Plaintiffs' Complaint lists Brave Optical's franchise date as some time in 2013, and Western State's as some time in 2019. Plaintiffs don't object to Luxottica's more specific dates in their response, (Doc. 26)— and the 2016 date is more favorable to Brave Optical than its 2013 allegation, anyway—so the Court uses the dates Luxottica provided.

11, #116). Both predate the limitations period, which started on December 4, 2019 (as Plaintiffs filed suit on December 4, 2023). (*Id.*). Plaintiffs allege that their FAs constitute unlawful "tying agreements" that conditioned their franchise licenses to their commitment to purchase frames only from Luxottica through its Eyecon program. (Doc. 1, #37–39). So, according to them, each time a franchisee paid "higher inventory prices for low quality merchandise as a result of Luxottica's implementation of Eyecon, a violation occurred that restarted the statute of limitations as to that injury." (Doc. 26, #632). But the Sixth Circuit's decisions "have repeatedly emphasized that profits, sales, and other benefits accrued as the result of an initial wrongful act"—here, the alleged tying agreements themselves—"are not treated as 'independent acts.' Rather, they are uniformly viewed as 'ripples' caused by the initial injury, not as distinct injuries themselves.'" *Z Techs. Corp.*, 753 F.3d at 600 (citing *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989) ("[R]eceipt of profits from an illegal [tying] contract by an antitrust defendant is not an overt act of enforcement which will restart the statute of limitations.")).

In arguing the contrary, Plaintiffs rely on non-binding Eighth Circuit caselaw. According to Plaintiffs, "[c]ourts have consistently held that each transaction that violates antitrust laws is an overt act." (Doc. 26, #631). More specifically, that "[e]ach sale to the plaintiffs in a price fixing conspiracy starts the statutory limitations period running again." (*Id.* (quoting *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1064 (8th Cir. 2017))).

Three considerations lead the Court to a different understanding. First, holdings from other circuits do not bind this Court—especially when they conflict with the Sixth Circuit's caselaw. *Compare Propane Tank*, 860 F.3d at 1064, *with Travel Agent*, 583 F.3d at 902.

Second, putting aside its non-binding nature, the Eighth Circuit's holding relied on a passing remark in a Supreme Court opinion discussing a different statutory scheme. (Doc. 26, #631). Specifically, in *Klehr v. A.O. Smith Corp.*, the source of the quote in *Propane Tank*, the Supreme Court confronted a statute-of-limitations question about claims under the Racketeer Influenced and Corrupt Organizations Act (more commonly known as the civil RICO). 521 U.S. 179, 182 (1997). And in answering that question, the Court compared the lower court's approach to the civil RICO's statute of limitations with statutes of limitations in other contexts—including federal antitrust law. *Id.* at 189–90. During that discussion the Court stated that "in the case of a 'continuing violation,' say, a price-fixing conspiracy …, 'each overt act that is part of the violation and that injures the plaintiff,' e.g., each sale to the plaintiff, 'starts the statutory period running again[.]'" *Id.* (citations omitted). But as the Eighth Circuit recognized, the Supreme Court's statement was necessarily dicta, as it involved statutes not at issue in the case. *Propane Tank*, 860 F.3d at 1064–65. True, the Eighth Circuit found it should follow the dicta, which it characterized as consistent with long-standing Supreme Court precedent. *Id.* But this Court respectfully disagrees. Or at the very least, as noted above, this Court concludes that the Sixth Circuit has adopted a contrary view of

Supreme Court precedent, under which not every above-price sale restarts the limitations period.

Moreover, even putting that aside and taking the sentence from *Klehr* at face value, its meaning is circumscribed by its own terms. The Supreme Court was not saying that in *all* price-fixing conspiracies, every sale to the plaintiff is an overt act that resets the limitations period. Rather, the quoted sentence's first clause indicates that the rest of the sentence's content applies only to those price-fixing conspiracies that *already count* as continuing violations. That limitation is proven further still by the cases the Supreme Court cited for support, which included *Siemens Medical Systems*. *Klehr*, 521 U.S. at 189–90. There the Sixth Circuit explicitly recognized that later injuries "compelled by" a prior act *wouldn't* constitute continuing violations.[9] *Siemens Med. Sys.*, 100 F.3d at 468.

That observation also foreshadows the final problem with Plaintiffs' reliance on *Propane Tank*: the Eighth Circuit misreads Sixth Circuit caselaw. In noting that "[e]very other circuit to consider [the continuing-violation] issue applies *Klehr*," the Eighth Circuit cited *In re Travel Agent Commission Antitrust Litigation*. *Propane Tank*, 860 F.3d at 1065–66. But the *Travel Agent* court *distinguished Klehr*. 583 F.3d

---

[9] That gives rise to the following question: what kind of price-fixing conspiracies *would* count as "continuing violations"? While the Sixth Circuit has not expressly addressed that question, one possible answer may be that, where the purchasers are not *themselves* parties (directly or indirectly) to the contracts that create the alleged price-fixing arrangement, then perhaps each new sale would be a continuing violation that created a new and independent harm. Here, though, the harm all "ripples" from the franchise agreement and the master agreement that the franchise agreement tacitly incorporates. Under cases like *Travel Agent*, additional sales under an already executed agreement do not constitute new and independent harms, at least in the Sixth Circuit.

at 902. Indeed, the *Travel Agent* court ultimately followed this Circuit's previous holding in *Siemens Medical Systems* (described above) and explained that "[a]lthough [a defendant's] participation in the alleged conspiracy would certainly create a rippling effect," the defendant's "final act to effectuate that conspiracy"—that is, the last overt act—occurred when it agreed with its competitors to fix prices. *Id.* In short, the Sixth Circuit simply does not agree that every new sale at an allegedly inflated price constitutes a new and independent overt act—at least not when those sales all occur pursuant to a single contractual arrangement between the parties.

And there is good reason for that. If this Court were to adopt Plaintiffs' "continuing violation theory, the applicable limitations period for a [Sherman Act] claim would be infinite—an antitrust plaintiff could routinely salvage an otherwise untimely claim by asserting that it continues to lose revenue because of past alleged anticompetitive conduct." *Id.* Because binding Sixth Circuit caselaw affirms that such a holding would contravene the very purposes of the statute of limitations, the Court **DISMISSES** Plaintiffs' antitrust claims **WITH PREJUDICE**.

## B. Plaintiffs' Breach of Contract Claims Are Unsupported by Contractual Language.

Plaintiffs allege Luxottica breached their contractual obligations in three ways: (1) by "controll[ing] the managed care vision plans' relationship with franchisees," (2) by "requiring franchisees to purchase all—or substantially all—of their inventory from Luxottica," and (3) by "allowing unknown third parties to access the class members' customer information." (Doc. 1, #39–40). But each allegation

18

shares the same fatal flaw: none are supported by contractual language from which the Court can infer a duty in the first place.

Before turning to those arguments, a word on choice of law is in order. The FAs contain a choice-of-law provision designating Ohio's law as governing the contracts. (Doc. 20, #190; *see* Doc. 26, #648–49). But contractual choice-of-law provisions do not necessarily supplant choice-of-law rules. In other words, the Court must first determine whether the contracts' designation of Ohio law is acceptable under the relevant choice-of-law rule. And to do so, the Court must identify the relevant choice-of-law rule. To answer that question, the Court starts with the basis of its jurisdiction. Plaintiffs invoke the Court's jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). (Doc. 1, #4). "Where the underlying basis for CAFA jurisdiction is diversity"—as it is in this case—"the forum state's choice of law rules apply." *Turnage v. Oldham*, 346 F. Supp. 3d 1141, 1150 (W.D. Tenn. 2018) (citing *Savedoff v. Access Grp., Inc.*, 524 F.3d 754, 760 n.5, 762 (6th Cir. 2008)). And "[u]nder Ohio law, a contract's choice-of-law provision governs 'unless the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice.'" *Dawson v. Allstate Vehicle & Prop. Ins.*, 709 F. Supp. 3d 444, 449 (S.D. Ohio 2024) (quoting *Schulke Radio Prods., Ltd. v. Midwestern Broad. Co.*, 453 N.E.2d 683, 686 (Ohio 1983)). Here, the chosen state— Ohio—has a sufficient relationship to the parties to support enforcing the choice-of-law provision, since Luxottica is a citizen of Ohio. (Doc. 1, #3). So Ohio law applies to Plaintiffs' breach-of-contract claim.

19

Under Ohio law, a breach-of-contract plaintiff must ultimately establish (and thus at the motion-to-dismiss stage must plausibly allege) "the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Anadarko E & P Co. v. Northwood Energy Corp.*, 970 F. Supp. 2d 764, 769 (S.D. Ohio 2013) (quotation omitted). And "[a]s the Sixth Circuit has explained, it is a basic tenet of contract law that a party can only advance a claim of breach of written contract by identifying and presenting the actual terms of the contract allegedly breached." *Doe v. BMG Sports, LLC*, 584 F. Supp. 3d 497, 507 (S.D. Ohio 2022) (cleaned up).

None of the three claims here find support in the "actual terms of the contract allegedly breached." *Id.* First, Plaintiffs allege that Luxottica breached the terms of the FAs by "controll[ing] the managed care vision plans' relationships with franchisees." (Doc. 1, #39–40). But it doesn't point to a specific contractual provision that prohibited Luxottica from doing so. All Plaintiffs muster is that "[n]o iteration of the [FA] states that Luxottica may dictate the managed care plans in which a franchisee may operate." (*Id.* at #39). But the mere absence of a provision explicitly *enabling* Luxottica to have the final say on vision care plan participation doesn't automatically mean that the contract *prohibited* Luxottica from doing so. And for what it's worth, Plaintiffs seem to have abandoned this claim by failing to respond to Luxottica's argument for its dismissal. (*See* Doc. 26, #642–44).

Second, Plaintiffs allege that Luxottica breached the FAs by "requiring franchisees to purchase all—or substantially all—of their inventory from Luxottica."

(Doc. 1, #40). That requirement constitutes a breach, so the argument goes, because "[t]he 2013–2018 franchise agreements … stated that franchisees may control their own inventory selection." (*Id.*). There are two problems with that argument. First, Western State's FA was the 2019 version, and Plaintiffs don't allege anywhere in their Complaint that the 2019 FA allowed franchisees to select any of their own inventory. But more fundamentally, Plaintiffs' own citations to the FA versions in force between 2013 and 2018 show that each of those agreements explicitly contemplated Luxottica's ability to control their inventories. (*See, e.g.*, *id.* at #18 nn.16 & 17 (citing 2013 FA, which provides that franchisees must "purchase [inventory] from [Luxottica] or an approved supplier" and "display and sell only merchandise approved by [Luxottica]")).[10] So with respect to this claim, Plaintiffs not only fail to point to a contractual provision that prohibits Luxottica's alleged conduct, but in fact plead provisions that facially contemplate Luxottica exerting plenary control over their inventories.

Third, Plaintiffs allege that Luxottica breached the FAs by "allowing unknown third parties to access the class members' customer information" as a result of the 2021 data breach. (*Id.* at #40). Once more, though, they don't identify a contractual provision that Luxottica breached by suffering a cyberattack. Instead, they point to a provision of the FAs granting Luxottica "a perpetual, worldwide, non-exclusive, irrevocable, and royalty-free license to use and share Customer Information for marketing, advertising, and any other legitimate business purpose." (*Id.*). And once

---

[10] Each version of the FA includes a similarly worded provision.

21

more, that provision doesn't create a duty that Luxottica breached when its data was stolen. It *grants* Luxottica a license to use franchisees' data, but does not simultaneously impose a duty to keep that information safe.

So because Plaintiffs have failed to identify contractual provisions imposing the duties they allege Luxottica to have breached, the Court **DISMISSES** Plaintiffs' claims for breach of contract and breach of the implied covenant of good faith and fair dealing **WITHOUT PREJUDICE** as to seeking leave to amend the claims with allegations of specifically breached contractual provisions.

## C. Plaintiffs' Reliance on Ohio Statutory Law Is Misplaced.

Plaintiffs advance two claims under Ohio statutory law: one under the DTPA, and the other under the BOPA. (Doc. 1, #43–45). But since both Plaintiffs are non-Ohio entities, their invocation of Ohio law contravenes the "fundamental principle that a state cannot punish conduct that does not occur within its borders nor causes any harmful effects within its borders," at least absent the state legislature's clear intention to do so. *Logan Farms v. HBH, Inc. DE*, 282 F. Supp. 2d 776, 790 (S.D. Ohio 2003); *see also Mitchell v. Abercrombie & Fitch*, No. C2-04-306, 2005 WL 1159412, at *2 (S.D. Ohio May 17, 2005) ("Generally, statutes are presumed not to have an extraterritorial effect unless the legislature clearly manifests a contrary intent."). Plaintiffs don't identify—and the Court cannot find—any provision of the DTPA or the BOPA manifesting the Ohio General Assembly's intent for those statutes to apply to harms suffered in Colorado (as to Western State) and Texas (as to Brave Optical).

Plaintiffs attempt to salvage their use of Ohio law by referring to their FAs' choice-of-law provision, which selects Ohio law to govern the contract. (Doc. 26, #648–49). But that provision also states that "[n]othing in [the choice-of-law provision] is intended to invoke application of any franchise or any similar law, rule or regulation, of the state of Ohio or any other state, which would not otherwise apply." (Doc. 28, #912). So, on its face, the choice-of-law provision carves out Ohio "franchise" or "similar law" that wouldn't apply absent the provision. To be sure, Plaintiffs could perhaps argue that the DTPA and the BOPA don't fall within that category. But they didn't.[11] And even if they did, the choice-of-law question—i.e., "which state's deceptive trade practices law applies to the claims in this case"—is distinct from the extraterritoriality question, which is oriented to the "reach of the [state] statute" (regardless of *which* state's statute it is). *McClendon v. N.C. Mut. Life Ins.*, 406 F. Supp. 3d 677, 682 n.4 (M.D. Tenn. 2019). So even if the Court accepts (without deciding) that the choice-of-law provision *does* select Ohio's DTPA and BOPA, the question remains of whether the scope of those laws extends past Ohio's borders. *See HandMaker v. CertusBank, N.A.*, No. 3:15-cv-129, 2015 WL 13635662, at *6–7 (W.D. Ky. July 7, 2015) (explaining that if a law doesn't apply extraterritorially, "courts will

---

[11] Plaintiffs point to *CajunLand Pizza, LLC v. Marco's Franchising, LLC*, for the proposition that "given the Ohio choice of law provision, non-Ohio franchisees may state claims against Ohio-based Luxottica for violations of the" Ohio statutes. (Doc. 26, #648–49 (citing 513 F. Supp. 3d 801, 806–07 (N.D. Ohio 2021))). Two features distinguish that case from this one. First, the choice-of-law provision controlling the franchise relationship in that case was "extremely broad," lacking a carveout like the one in Plaintiffs' FAs. *CajunLand*, 513 F. Supp. 3d at 805. Second, and more fundamentally, Plaintiffs' reliance on *CajunLand* conflates the "which law applies" question with the "what's the applicable law's scope" question, though the two are distinct. *See McClendon*, 406 F. Supp. 3d at 682 n.4 (explaining that "the reach of the [state] statute" is distinct from "which state's [statute] applies" in the first place).

not apply it to parties falling outside [the state's jurisdiction], even if the parties stipulate that the law should apply"). And the parties identify no statutory provision or judicial interpretation that supports reading either law as doing so.

At bottom, Plaintiffs have not alleged any facts or law that would support the application of Ohio's statutes to their claims. So the Court **DISMISSES** the statutory claims **WITHOUT PREJUDICE** as to seeking leave to amend the claims under an appropriate state's (or states') law.

### D.    The Tort Claims Fare No Better.

Plaintiffs' remaining claims arise under Ohio's tort law. For a variety of reasons, they all fail.

#### 1.    Negligent or Fraudulent Misrepresentation.

Plaintiffs bring claims for two varieties of misrepresentation: the negligent sort and the fraudulent sort. (Doc. 1, #41–43). Both are time-barred.

Start with the negligent-misrepresentation claim. Luxottica argues—and Plaintiffs don't contest—that the negligent-misrepresentation claim is time-barred. (Doc. 19, #133). Such claims are subject to a four-year statute of limitations. *Neff v. Std. Fed. Bank*, No. 2:06-cv-856, 2007 WL 2874794, at *6 (S.D. Ohio Sept. 27, 2007) (citing Ohio Rev. Code § 2305.09(D)). The alleged misrepresentations on which Plaintiffs base their claim necessarily predate Plaintiffs' FAs (since they were geared toward inducing Plaintiffs to sign the FAs). And since both Plaintiffs signed their FAs more than four years before filing suit, Luxottica's alleged negligent misrepresentations took place even longer ago.

The fraudulent-misrepresentation claim is slightly more complicated, although the end result is the same. Such claims are subject to the same four-year statute of limitations that applies to negligent-misrepresentation claims. *Fordyce v. Hattan*, 141 N.E.3d 574, 582–83 (Ohio Ct. App. 2019). But there's one important difference: the limitations period for fraudulent-misrepresentation claims only starts running "when the plaintiff discovers or, through the exercise of reasonable diligence, should have discovered the fraud." *Id.* This "discovery rule" means that fraudulent-misrepresentation claims can remain timely long after negligent-misrepresentation claims have expired. But that's not an issue in this case, since, by Plaintiffs' own allegations, they discovered Luxottica's alleged misrepresentations no later than 2018, when Luxottica "effectively made [Eyecon's] use mandatory" by, among other things, conditioning franchisees' in-network status with VSP on their Eyecon use. (Doc. 1, #14, 23). Indeed, by 2018, "nearly half of franchisees formed the Pearle Vision Independent Franchise Associate [sic] because they were concerned" about Eyecon's rollout. (*Id.* at #34 (cleaned up)). Plaintiffs ask the Court to draw a counter-logical inference from those representations: that they only learned of Luxottica's alleged fraud within four years of filing suit—that is, after December 2019. (Doc. 26, #645). But such an inference would fly in the face of Plaintiffs' own allegations—which the Court must accept as true at the motion-to-dismiss stage.

Because the negligent and fraudulent misrepresentation claims are time-barred, the Court **DISMISSES** those claims **WITH PREJUDICE**.

## 2.    Tortious Interference.

Plaintiffs bring a claim for tortious interference with their business and contractual relationships. (Doc. 1, #45–46). Much like their antitrust and misrepresentation claims, this claim is time-barred.

"The Ohio statute of limitations for tortious interference claims is four years." *Vitek v. AIG Life Brokerage*, No. 06-cv-615, 2008 WL 4372670, at *9 (S.D. Ohio Sept. 22, 2008) (citing Ohio Rev. Code § 2305.09(D)). "The statute begins to run when the 'events giving rise to the claim occur.'" *Id.* (quoting *Koury v. City of Canton*, 221 F. App'x 379, 386 (6th Cir. 2007)). The "continuing violation" doctrine does not apply to such claims. *See id.* at *10 n.9; *see also Naiman Fam. Partners, L.P. v. Saylor*, 161 N.E.3d 83, 88–89 (Ohio Ct. App. 2020) (declining to apply the continuing violation exception to a tortious interference claim because "[i]n Ohio, the continuing tort doctrine is usually employed in cases involving injury caused by a trespass to real property").

The allegations on which Plaintiffs base their tortious interference claim predate the four-year limitations period. Plaintiffs allege that Luxottica interfered with their relationships with customers, vendors, and managed vision care plans by requiring participation in Eyecon and by controlling franchisees' relationships with VSP. (*See* Doc. 1, #45–46). But those alleged acts all began, with respect to franchisees generally, in 2014 (as to VSP) and by 2018 (as to Eyecon). (*Id.* at #13, 23). And they came to directly affect both Plaintiffs no later than November 2019, when the newer of the two entered the franchise. *See supra* note 7. Moreover, even if Luxottica allegedly engaged in additional conduct after Plaintiffs entered their respective

26

franchise agreements, those actions were all "in connection with" and "premised upon" the agreements themselves, and thus would not trigger a continuing violation exception to the statute of limitations. *Naiman Fam. Partners*, 161 N.E.3d at 89. In sum, because Plaintiffs filed this lawsuit in December 2023, their tortious interference claim is untimely.

Thus, under the applicable statute of limitations, the Court **DISMISSES** Plaintiffs' tortious interference claim **WITH PREJUDICE**.

### 3. Negligence and Negligence Per Se.

Plaintiffs' last two claims arise under Ohio negligence law. (Doc. 1, #46–48). Luxottica argues that the "economic loss doctrine" bars them. (Doc. 19, #137–38). Luxottica is right, but not for the reasons it raises.

"The economic loss doctrine holds that absent tangible physical harm to persons or tangible things there is generally no duty to exercise reasonable care to avoid economic losses to others." *Long v. Time Ins.*, 572 F. Supp. 2d 907, 911 (S.D. Ohio 2008) (quotation omitted). Plaintiffs haven't pleaded any injuries arising from Luxottica's alleged negligence aside from "loss of good will with customers and increased competition for … customers." (Doc. 1, #47). That strikes the Court as "economic loss [] unaccompanied by personal injury or property damage." *Long*, 572 F. Supp. 2d at 911.

That said, Luxottica reads the economic loss doctrine too broadly. In arguing that "[t]he existence of [a] contract forecloses Plaintiffs' negligence and negligence per se claims," (Doc. 19, #137), they elide the fact that "the key factor [in the economic

loss doctrine] is the extent, and more important, the source, of the duty owed by" one party to another, *Chemtrol Adhesives, Inc. v. Am. Mfrs. Mut. Ins.*, 537 N.E.2d 624, 630 (Ohio 1989). So the mere existence of a contract does not, by itself, foreclose tort claims between the contracting parties if negligence law imposes a duty of reasonable care independent of the alleged tortfeasor's contractual obligations. *See id.* at 630–31. So it's not the FAs' existence that forecloses Plaintiffs' negligence claims. Rather, it is that "the law of negligence does not extend … dut[ies of reasonable care] so far so to protect [purely] economic expectations." *Id.*

So because the injuries Plaintiffs allegedly suffered are of the sort recoverable only under a contract theory, the Court **DISMISSES** the negligence and negligence per se claims **WITHOUT PREJUDICE** as to seeking leave to amend with allegations of tangible injury to persons or property.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Luxottica's Motion to Dismiss (Doc. 19). As to the claims that are time-barred under the applicable statutes of limitations—i.e., Counts 1, 2, 3, 5, 6, and 9—the Court **DISMISSES** them **WITH PREJUDICE**. (Doc. 1, #36–39, 41–43, 45–46). The Court **DISMISSES** the remaining counts **WITHOUT PREJUDICE**, as Plaintiffs potentially could cure the deficiencies identified above through additional pleading. Plaintiffs may move to amend the dismissed Complaint within 30 days of the filing of this Opinion and Order and must attach the proposed amended pleading to any such motion. Failure to move within that time will result in the entry of judgment for Defendant. Finally, because

the Court dismisses all of Plaintiffs' claims, it also **DENIES** Luxottica's Motion to Strike Class Allegations, (Doc. 21), as **MOOT**.

      **SO ORDERED.**

March 31, 2025
_____          _____
**DATE**                                 **DOUGLAS R. COLE**
                                          **UNITED STATES DISTRICT JUDGE**